2006 WY 18

**Travis James᾽ CHAUNCEY,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 04–119.

Supreme Court of Wyoming.

Feb. 2, 2006.

Kenneth M. Koski, Public Defender, Donna D. Domonkos, Appellate Counsel; Diane Courselle, Director, University of Wyoming Defender Aid Program; James Mowry, Student Intern; and Christopher Humphrey, Student Intern, for Appellant.

Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and James Michael Causey, Assistant Attorney General, for Appellee.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1] In November 2003, a jury found Travis Chauncey (the appellant) guilty of two felonies: one count of conspiracy to deliver a controlled substance to a person under eighteen years of age in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(i), 35–7–1036(a), and 35–7–1042 (LexisNexis 2005); and one count of delivery of a controlled substance to a person under eighteen years of age in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(i) and 35–7–1036(a). On appeal from the judgment and sentence, he claims that he did not receive a fair trial because two exculpatory statements were not disclosed to him pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We affirm.

## ISSUE

[¶ 2] Whether the appellant's due process rights were violated because the prosecution failed to provide him with reports from two law enforcement interviews?

## FACTS

[¶ 3] During the late-night hours of October 27, 2002 or early-morning hours of October 28, 2002, CS, a sixteen year-old female, and eighteen year-old Joseph Onkka (Onkka) went to the home of the appellant and his

girlfriend, Stephanie Doherty (Doherty), to pick up methamphetamine.[1] CS obtained a small amount of methamphetamine and, after making various stops to purchase paraphernalia used to smoke the drug, CS and Onkka parked in a secluded spot and proceeded to use the methamphetamine. In due course, they were approached by police officers and CS admitted to possessing methamphetamine and later told the officers that she had received it from the appellant and Doherty.

[¶ 4] The appellant and Doherty were both charged with conspiracy to deliver a controlled substance to a person under eighteen years of age in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(i), 35–7–1036(a), and 35–7–1042. The appellant was also charged with one count of delivery of a controlled substance to a person under eighteen in violation of Wyo. Stat. Ann. §§ 35–7–1031(a)(i) and 35–7–1036(a).

[¶ 5] Doherty's trial began August 6, 2003[2]—three months before the appellant's trial. At Doherty's trial, CS was the State's primary witness. CS testified that she had talked to Doherty in the morning or afternoon of October 27, 2002, and they had discussed CS finding buyers for some of Doherty's methamphetamine. Later that night, she called the appellant's home phone to speak with Doherty again. The appellant answered and, after CS identified herself, the appellant allowed her to talk to Doherty, who told CS that she could retrieve the methamphetamine owed to her. CS then picked up Onkka and called the appellant again to ask him if he wanted her "to come out there and get it real quick or what?" According to CS, the appellant responded, "Yeah."

[¶ 6] CS further testified that she met the appellant at his trailer and went with him into a back bedroom, where Doherty was sleeping. Onkka, meanwhile, waited in the living room. Doherty told the appellant to give CS some methamphetamine out of a camera case in the bedroom. The appellant and CS agreed on what "look[ed] like about" a quarter-gram and CS left with Onkka.

Shortly thereafter, and once she and Onkka had used part of this methamphetamine, they were arrested. CS was cross-examined extensively about her drug use, previous arrests, and her ability to recall these events.

[¶ 7] Leanne Richardson (Richardson) testified in Doherty's defense. Richardson knew the appellant and Doherty and was dating the appellant's brother, Wes Chauncey. During October 2002, Richardson and Wes Chauncey were living with the appellant and Doherty in the appellant's trailer. Richardson also babysat for the appellant and Doherty. She testified that she often used drugs with CS, had given her a quarter—to a half-gram of methamphetamine during the morning of October 27 and that, in her opinion, this was the methamphetamine CS had been caught with later that night. According to Richardson, the appellant and Doherty had gone to sleep early in the evening on October 27 before CS arrived. In Richardson's version of events, CS asked her to "do" a bag of speed, but Richardson refused because she did not want to be caught using drugs while she was supposed to be watching the appellant's and Doherty's child. She testified that after she refused to use any methamphetamine, CS left the house. Richardson opined that CS "would lie to everyone. She would steal for anything she wanted." However, she also acknowledged that she had been in Wes Chauncey's bedroom all night, did not know how CS got in the trailer, and did not see her until she came to the bedroom door.

[¶ 8] On cross-examination, the prosecutor questioned Richardson about her involvement in "cooking" methamphetamine as well as her use of the drug. She also admitted that she had lied in many prior statements to the prosecutor and the Wyoming Division of Criminal Investigation (DCI). Ultimately, a jury found Doherty guilty of conspiring to deliver a controlled substance to a minor.

[¶ 9] After discovery and the State's purported disclosure of *Brady* material, the ap-

---

1. CS and Onkka did not intend to purchase the methamphetamine because CS had previously purchased a gram of methamphetamine from Doherty which was "short." CS intended to go that evening to pick up the remainder of the "shorted" gram.

2. On the appellant's motion, the file in this case was supplemented with portions of the transcript from Doherty's trial.

pellant's trial began on November 5, 2003. The State's case was similar to the one it had presented at Doherty's trial. CS's testimony remained substantially the same as her testimony during Doherty's trial.[3] Similar to the Doherty trial, CS was extensively questioned on cross-examination about previous probation, sentences to juvenile detention centers, failed drug tests, past drug use, and her ability to remember the events and details of the night in question. She was also impeached regarding inconsistencies in her testimony.

[¶ 10] Appellant called Doherty as his only witness. She had already been found guilty in her trial and, at appellant's trial, she testified that she had sold the methamphetamine to CS and that the appellant was not involved in the transaction. Nevertheless, the jury found the appellant guilty of both counts.

[¶ 11] While awaiting sentencing in the Sheridan County Detention Center, the appellant obtained information from another inmate, Paul Gunnett (Gunnett), that the appellant believed to be exculpatory. Included in the material Gunnett provided to the appellant were two summaries of interviews conducted by DCI—one of CS and another of Richardson. The appellant filed a motion for a judgment of acquittal or for a new trial based on *Brady* and its progeny because the State had not previously disclosed these statements to the appellant. A hearing on this motion and the appellant's sentencing hearing were set for December 13, 2003. The district court denied the motion and proceeded with sentencing. On February 4, 2004, judgment was entered sentencing the appellant to two concurrent terms of not less than six—nor more than nine—years incarceration. The appellant now appeals that judgment.

## STANDARD OF REVIEW

[¶ 12] The United States Supreme Court stated in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), that "suppression by the prosecution of evidence favorable to an accused upon

request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." This rule exists to "ensure that a miscarriage of justice does not occur." *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985).

[¶ 13] "The holding in *Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or to punishment.'" *Id.*, 473 U.S. at 674, 105 S.Ct. at 3379 (*quoting Brady*, 373 U.S. at 87, 83 S.Ct. at 1196).

> In order to establish a *Brady* violation, a defendant must demonstrate that the prosecution suppressed evidence, the evidence was favorable to the defendant, and the evidence was material. *Helm v. State*, 1 P.3d 635, 639 (Wyo.2000). We have previously decided that the materiality of withheld evidence and its possible effect on the outcome of the trial are mixed questions of fact and law. *Id.* Generally, the denial of a motion for a new trial is reviewed for an abuse of discretion; however, a claim of failure to disclose evidence in violation of *Brady* is properly reviewed de novo. *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir.1994).

*Davis v. State*, 2002 WY 88, ¶ 16, 47 P.3d 981, 985–86 (Wyo.2002). It is well-established that "[f]avorable evidence includes impeachment evidence." *Davis*, 2002 WY 88, ¶ 18, 47 P.3d at 986; *see also Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380 ("Impeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule") and *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972) ("When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule."). The *Brady* rule also extends to evidence gathered by investigating officers but not actually known to the prosecutor. *Davis*, 2002 WY 88, ¶ 14, 47

---

3. Again, CS testified that she had contacted the appellant and Doherty three times on October 27 and 28 before arriving at their home to pick up methamphetamine. However, at the appellant's trial, she testified that she did not speak to Doherty during the second call and instead arranged the transaction with the appellant.

P.3d at 985. Therefore, *Brady* and its progeny impose an affirmative duty on the prosecutor to learn of favorable evidence in the State's control and divulge such evidence to the defendant. *Id.*

## DISCUSSION

[¶ 14] The appellant received two documents prior to sentencing that he claims were exculpatory and should have been disclosed pursuant to *Brady*. The first was a summary of an interview with CS conducted by DCI on November 5, 2002. In that interview, CS detailed a methamphetamine distribution scheme devised by CS, Richardson, and Gunnett and identified twenty-seven people that she "sold methamphetamine to . . . and/or made arrangements for Richardson to sell methamphetamine to . . . ." The appellant claims that this information was favorable to him and material to his guilt because "[t]he interview tends to show inconsistency in [CS's] statements to authorities, raises questions as to her credibility, and tends to show Mr. Chauncey's innocence."

[¶ 15] The second document at issue is an interview of Richardson conducted by DCI on January 7, 2003. In that interview, Richardson stated:

> Shortly after RICHARDSON met GUNNETT, RICHARDSON met Stephanie DOHERTY, who had previously dated GUNNETT. RICHARDSON became friends with DOHERTY and her boyfriend, Travis CHAUNCEY. RICHARDSON would babysit DOHERTY and CHAUNCEY's child. . . . During the time that RICHARDSON was associated with them, RICHARDSON never saw DOHERTY, Travis CHAUNCEY or Wes CHAUNCEY sell any drugs.

The appellant claims that his right to due process under the United States Constitution was violated by the suppression of this statement.

### CS Interview

■ [¶ 16] As noted above, CS was interviewed about those individuals to whom she

sold—or made arrangements to sell—methamphetamine. The appellant, however, claims that CS was creating an exhaustive list of "twenty-seven (27) individuals to whom she had sold and/or delivered drugs or individuals who were involved in the illegal drug business with whom she had contact." He further characterizes this statement as one in which CS "named her sources" and identified people "who were in the illegal drug business." Therefore, the appellant claims CS's omission of his name from that list tends to show that he was not involved in the illegal methamphetamine trade. The appellant further claims that, had the information been provided to him prior to trial, it would have been a valuable impeachment tool to show that CS was deeply involved in selling methamphetamine and that CS had been inconsistent in her statements to the police (in another DCI interview on October 28, 2002, CS had implicated the appellant as one of her sources).

■ [¶ 17] Much of the appellant's argument can be dismissed because he mischaracterizes the content of CS's November 5, 2002 interview. CS was naming the people she provided drugs to, not her "sources" for obtaining drugs, as the appellant claims. The appellant was charged with conspiring to deliver, and delivery of, methamphetamine and there is no indication in the record that he ever purchased methamphetamine from CS. Therefore, this list of individuals does not tend to prove that the appellant was not involved in the illegal drug trade, as the appellant claims. At most, it tends to show that the appellant never purchased methamphetamine from CS, which information was not an issue in this case. Furthermore, CS's interviews with DCI were not inconsistent because the October 28 interview concerned whether CS had obtained methamphetamine from the appellant on October 27 or 28, while the November 5 interview dealt with the unrelated matter of to whom CS had sold methamphetamine through a distribution scheme she developed with Richardson and Gunnett.[4] A "prosecutor is not required to

---

4. In his reply brief, the appellant claims that because CS mentioned Richardson and Gunnett, she must have been naming all of her sources as well as those to whom she sold methamphetamine. Even from a cursory reading of DCI's summary of CS's interview, however, it is evident that CS was merely describing a distribution scheme she had entered into with Richardson and Gunnett and was not attempting to identify everyone "in the illegal drug business."

deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial...." *Bagley,* 473 U.S. at 675, 105 S.Ct. at 3380 (footnote omitted). When the material sought simply has no bearing in a case, it is not favorable and non-disclosure of that information is not error.

[¶ 18] The question remains whether the CS interview should have been disclosed as favorable and material evidence because it had value as an impeachment tool. As noted above, it is well-established that impeachment evidence such as this is favorable to an accused. The critical issue then, is whether this information was material. The

> touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'

*Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995) (*quoting Bagley,* 473 U.S. at 678, 105 S.Ct. at 3381).

[¶ 19] The appellant argues that the information from CS's interview was material pursuant to our holding in *Davis.* In that case, Davis had been convicted of conspiracy to deliver methamphetamine and delivery of methamphetamine. *Davis,* 2002 WY 88, ¶ 1, 47 P.3d at 982. His conviction was due largely to the testimony of one witness, Morris, who testified that Davis had participated in the sale of one gram of methamphetamine. *Id.* at ¶ 7, 47 P.3d at 983. Three days after Davis was sentenced, he learned of a taped conversation between Morris and an informant that recorded Morris using narcotics. *Id.* at ¶ 11, 47 P.3d at 984. We reversed and remanded that case for a new trial reasoning that "[i]mpeachment evidence that could be used to discredit such an important witness or cast doubt on her veracity is usually material." *Id.* at ¶ 22, 47 P.3d at 987. In *Davis,* the credibility of Morris was particularly im-

portant and the state took affirmative steps to establish her as a recovering addict who was trustworthy. *Id.* at ¶¶ 7–9, 47 P.3d at 983–84. Therefore, the recorded evidence that directly contradicted her testimony made it reasonably probable that Davis did not receive a fair trial. *Id.* at ¶ 22, 47 P.3d at 987.

[¶ 20] This case presents a much different situation than *Davis.* Whereas in *Davis,* Morris could not effectively be impeached without the suppressed information, in the instant case, CS's credibility was extensively challenged. At the appellant's trial, the district court expressly allowed the defense wide latitude in impeaching CS and testing her veracity because, according to the trial judge, "[a]fter the *Dysthe [v. State,* 2003 WY 20, 63 P.3d 875 (Wyo.2003),] case that the Supreme Court recently decided, I'm pretty nervous about not allowing full inquiry of prosecution witnesses." Any impeachment evidence that could be gleaned from the November 5 interview became known to the jury. CS did not deny her involvement in the distribution and use of narcotics. Specifically, the jury had been told that CS was a "worldly young lady" who received special deals from methamphetamine dealers because she was able to set the dealers up with other buyers. On direct and cross-examination, CS's past use of methamphetamine, marijuana, and cocaine was explored, as were her previous drug-related arrests and convictions and her difficulty abstaining from narcotics. CS was also questioned about her mental state on the night in question, to which she replied that she had used methamphetamine earlier on October 27 and that night she was, "[n]ot really high, but more just coming down." The appellant was also given extensive discovery materials that included statements by CS and another individual tending to show she was heavily involved in using and selling narcotics. Finally, the appellant had CS's testimony from Doherty's trial which detailed CS's drug use and which was also used at the appellant's trial to impeach CS.

[¶ 21] We have said that "[e]vidence which is 'at best cumulative' does not meet the *Bagley* materiality standard." *Relish v.*

*State*, 860 P.2d 455, 460 (Wyo.1993) (*quoting United States v. Perkins*, 926 F.2d 1271, 1275 (1st Cir.1991)); *see also United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir.1998) ("We agree with the district court the undisclosed impeachment evidence was cumulative to Mr. Ladd's testimony on direct and cross-examination, and thus would have provided only marginal additional support for Mr. Trujillo's defense."). While we reaffirm our holding in *Davis* that impeachment evidence relating to the State's principal witness is usually material, materiality still must be independently analyzed under the *Kyles/Bagley* formulation and we must ask whether "evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566 (*quoting Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381). Where, as in the instant case, a witness for the State has been exhaustively impeached, both generally and as to the specific issue addressed by the suppressed evidence, we do not believe that one additional piece of cumulative information makes the verdict unworthy of confidence.

[¶ 22] In two sentences, the appellant also claims for the first time in his reply brief that we must find this interview to be favorable both because if CS was involved in dealing methamphetamine, she would not need to purchase small amounts from the appellant for her personal use, and because it tended to prove that CS was attempting to "curry favor with law enforcement by assisting in obtaining [a] conviction[ ] against" the appellant. Besides suffering from the fatal flaw of being raised for the first time in the appellant's reply brief, *see, for example, Pena v. State*, 2004 WY 115, ¶ 44 n. 6, 98 P.3d 857, 874 n. 6 (Wyo.2004) and W.R.A.P. 7.03, these arguments must fail because, again, the impeachment material contained in the November 5 interview was already presented to the jury from other sources and these new arguments could have been made by defense counsel based on the materials already in his possession. We will, therefore, not consider these arguments further.

### Richardson Interview

[¶ 23] The appellant next claims that the summary of Richardson's January 7, 2003 interview, quoted above, was suppressed in

violation of *Brady*. Specifically, the appellant claims the information could have been used substantively to show his innocence, to impeach CS by contradiction, and would have carried great weight at trial because it was a statement given to DCI and, as a result, the jury would not have viewed it as "self-serving." Therefore, we must determine whether the Richardson interview was suppressed, favorable, and material. *Davis*, 2002 WY 88, ¶ 16, 47 P.3d at 985.

[¶ 24] Although the State appears to concede that the Richardson interview was "suppressed" for purposes of our analysis, it actually presents us with a suppression argument couched in materiality terms. The State argues, as it did in the district court, that Richardson's testimony in Doherty's trial contained the same information as the Richardson interview and that the State had no duty to disclose the interview because the appellant had access to the record in Doherty's trial. Further, the State claims that the appellant "was in a solid position without the DCI report to have evaluated Richardson's availability and usefulness as a defense witness" because of his personal relationship with her. The appellant equivocally responds that his trial counsel was unsure whether he had ever seen Richardson's testimony in the Doherty trial and suggests in his reply brief that it is the State's burden to prove that he reviewed Richardson's previous testimony.

[¶ 25] The Second Circuit Court of Appeals has said that "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983) (internal citations omitted); *see also Relish*, 860 P.2d at 459 (citing with approval the *LeRoy* court's reasoning). The fact that the appellant's trial attorney used CS's testimony from Doherty's case as an impeachment tool satisfies us that he had access to and reviewed the record in that case. If he failed completely and diligently to review that record and, as a consequence, overlooked Richardson's testimony, that evidence

was not suppressed by the State and no *Brady* violation occurred.

[¶ 26] However, the State admits that the content of Richardson's testimony in Doherty's case does not exactly address the information contained in Richardson's January 7, 2003 interview. Richardson testified at Doherty's trial that she had spoken to CS on the night of October 27, 2002, and believed she had given CS the methamphetamine she possessed when she was arrested on October 28. However, according to Richardson, she was in Wes Chauncey's bedroom all night and did not know CS was in the trailer until she came to the bedroom door. Therefore, she did not testify about who, if anyone, had let CS into the trailer or who CS had encountered inside the trailer before coming to Richardson's bedroom. In contrast, during Richardson's January 7, 2003 interview, she simply stated that she never saw Doherty or the appellant sell any drugs and made no reference to the events of October 27 and 28. Richardson's interview and her testimony in Doherty's trial, while similar, are not identical and the question remains whether the specific content of the interview was suppressed, favorable, and material.

[¶ 27] The State argues that, due to the personal relationship between the appellant and Richardson, the appellant "was in a better position than the prosecution" to determine how useful Richardson would be as a defense witness. While this may be true, this argument ignores the edict of *Brady* and its progeny that information in the possession of the State may not be suppressed if it is favorable and material. The State has presented us with no authority to suggest that the content of a witness' interview with law enforcement officers is equally available to a defendant when the defendant is acquainted with that witness. Absent such an argument, this interview appears to be suppressed under *Brady*.

[¶ 28] The State has also failed to convince us that the content of the January 7 interview was not favorable to the appellant. The State concedes that, because she lived in the trailer and babysat the appellant's child, Richardson had a close personal relationship with the appellant. It seems clear that, by virtue of this relationship, Richardson's statement that she had never seen the appellant sell drugs would meet our evidentiary requirement of relevance (*see* W.R.E. 402) and, therefore, be at least marginally favorable to the appellant.

[¶ 29] While the Richardson interview was suppressed and favorable to the appellant, the State is correct that, in this case, the information was not material. The State aptly notes that the appellant's argument regarding the Richardson interview is inconsistent with his trial strategy. Doherty testified for the appellant at trial and she claimed full responsibility for selling methamphetamine to CS. Doherty also testified during cross-examination that Richardson had lied when she testified at Doherty's trial that she had given CS methamphetamine on October 27, 2002, and had spoken to her later that night at the appellant's home. Richardson's interview, however, tended to show that neither the appellant nor Doherty were involved in the sale of narcotics and in the Doherty case, Richardson testified that she had provided CS with the methamphetamine she possessed on October 28. The appellant, therefore, faces the initial materiality challenge of showing that a statement which contradicts his main witness creates a reasonable probability of a different result. *Kyles*, 514 U.S. at 434, 115 S.Ct. at 1566.

[¶ 30] In his reply brief, the appellant claims that, had the Richardson interview been disclosed, he "might have" presented his defense differently. Conspicuously absent from the appellant's argument, however, is any claim that, with this information, the appellant actually *would* have changed his trial strategy and how that change would have made a different result reasonably probable.

[¶ 31] For clarity, we reiterate that the only piece of evidence being reviewed under the *Bagley* materiality test is Richardson's January 7, 2003 interview. Because Richardson's testimony during Doherty's trial was not suppressed, the question before us is whether it is reasonably probable that the result in the appellant's trial would have been different had the State disclosed the summary of the Richardson interview.

[¶ 32] If we assume that the appellant would have changed his trial strategy based on the Richardson interview, this information

was still not material under *Brady.*[5] Even if we were to go one step further and assume that one statement in a DCI interview would have inspired the appellant comprehensively to examine Richardson as a potential witness such that he would uncover all of the information to which she testified in Doherty's trial, we still do not find such testimony to be material. The practical effect would be to adopt the same trial strategy that resulted in Doherty's conviction. As in Doherty's trial, the jury would be faced with a credibility determination between Richardson and CS. It is clear from the record and the transcript of Richardson's testimony in Doherty's trial that Richardson, like Doherty and CS, was deeply involved in using and selling narcotics and she also played a role in manufacturing methamphetamine. Richardson's efficacy as a witness would also be marred, as it was in Doherty's trial, by the fact that she had no firsthand knowledge of any contact between CS and the appellant that night and, during cross-examination at the Doherty trial, she admitted to lying and "not telling [DCI] everything" during her interviews with them. Under these circumstances, switching one witness who claimed to be at fault for another neither makes a different result reasonably probable, nor does it undermine our confidence in the outcome of the trial. Richardson's interview was, therefore, not material and its nondisclosure was not a violation of *Brady.*

[¶ 33]   We affirm.

---

**5.** A variety of courts have recognized that information that could cause a defendant to change his trial strategy may be material under *Brady. See, for example, Hutchison v. Bell,* 303 F.3d 720, 744 (6th Cir.2002); and *United States v. Pelullo,* 173 F.3d 131, 135 (3d Cir.1999).