# THE SUPREME COURT, STATE OF WYOMING

# 2025 WY 99

APRIL TERM, A.D. 2025

September 12, 2025

JUSTIN SCOTT LAKE,

**Appellant**
**(Defendant),**

**v.**                                                                    S-25-0030

**THE STATE OF WYOMING,**

**Appellee**
**(Plaintiff)**

*Appeal from the District Court of Campbell County*
*The Honorable Stuart S. Healy III, Judge*

*Representing Appellant:*
   Office of Public Defender: Brandon T. Booth, State Public Defender; Kirk A. Morgan, Chief Appellate Counsel; Jeremy Meerkreebs, Assistant Appellate Counsel. Argument by Mr. Meerkreebs.

*Representing Appellee:*
   Bridget Hill, Attorney General; Jenny L. Craig, Deputy Attorney General; Kristen R. Jones, Senior Assistant Attorney General; Leanne J. Johnston, Assistant Attorney General. Argument by Ms. Johnston.

*Before BOOMGAARDEN, C.J., and GRAY, FENN, and JAROSH, JJ., and Hibben, D.J.*

NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.

**FENN, Justice.**

[¶1]   A jury convicted Justin Lake of one count of first-degree sexual abuse of a minor and four counts of second-degree sexual abuse of a minor.  On appeal, Mr. Lake contends the district court abused its discretion when it found the minor victims, IB and TL, were competent to testify.  He also asserts the district court erred when it denied his motions for a mistrial.  We affirm.

## ISSUES

[¶2]   Mr. Lake raises two issues, which we rephrase as:

I.   Did the district court abuse its discretion when it found IB and TL were competent to testify?

II.   Did the district court abuse its discretion when it denied Mr. Lake's motions for a mistrial?

## FACTS

[¶3]   Mr. Lake has four children from a previous marriage: TL, JL, SL, and BL.  Mr. Lake remarried, and he and his second wife share a son, HL.  Mr. Lake's second wife also has children from a previous marriage, including one of the alleged victims, IB.  Mr. Lake and his second wife each shared custody of their children from their previous relationships on a week on/week off basis, so there were times when all eight of the children were in their home at the same time.

[¶4]   In August 2023, a caseworker with the Department of Family Services (DFS), went to Prairie Wind Elementary School to speak with some of the children in the Lake household to investigate allegations that the home was dirty, the children did not have beds, they were not eating, and Mr. Lake was driving while intoxicated with the children in the vehicle.  The DFS caseworker spoke to Mr. Lake's stepdaughter, IB, and she disclosed alleged sexual abuse.  The DFS caseworker reported IB's disclosure to the Gillette Police Department.  The DFS caseworker and members of the Gillette Police Department contacted Mr. Lake and his second wife to create a safety plan for the children, which involved Mr. Lake vacating the residence while the investigation was pending.

[¶5]   A detective with the Gillette Police Department arranged for IB to participate in a forensic interview.  During this interview, IB made statements that led the police to identify Mr. Lake's daughter, TL, as another potential victim.  The detective also arranged a forensic interview of TL.  Based on disclosures made by IB and TL in those interviews, the State charged Mr. Lake with one count of first-degree sexual abuse of a minor and one

1

count of second-degree sexual abuse of a minor involving TL, and three counts of second-degree sexual abuse of a minor involving IB.

[¶6]    Prior to the trial, Mr. Lake challenged IB's and TL's competency to testify. The district court conducted a hearing on Mr. Lake's motion. After questioning both children, the district court found they were competent to testify.

[¶7]    At the trial, TL testified about an occasion where Mr. Lake came into her bedroom and stuck his penis into her mouth. TL also testified about a time when she was taking a bath with IB. They were sitting in the tub together when Mr. Lake walked in and started touching her vagina. Mr. Lake then touched IB's vagina. He then left the bathroom without saying anything to them. During cross-examination, defense counsel asked TL if she remembered telling the forensic interviewer that Mr. Lake was "doing it with everyone." TL explained "everyone" meant herself, IB, and another sibling, JL. When asked why she thought things were happening to JL, TL indicated it was because JL had also spoken to the forensic interviewer.

[¶8]    IB testified about an occasion where Mr. Lake licked her vagina. She also testified about the incident that occurred when she and TL were taking a bath together. She stated Mr. Lake had touched her vagina and TL's vagina while they were in the bathtub. IB also testified about another instance where Mr. Lake forced her to touch his penis with her hand. During cross-examination, defense counsel asked IB if she remembered telling the forensic interviewer that Mr. Lake was also doing things to JL. Although she did not remember saying this to the interviewer, IB testified she believed Mr. Lake was doing things to JL. She could not articulate a reason for this belief.

[¶9]    While questioning the forensic interviewer, the State asked if she had interviewed any of the other children in the Lake household other than IB and TL. The forensic interviewer indicated she had interviewed RB and JL. The following exchange took place:

    Q. What about the other girls, were disclosures made?

    A. With R.B. there was not a disclosure. With J.L. there was
    a disclosure of some physical abuse?

    Q. No sexual abuse, though; is that correct?

    A. JL had a follow-up interview where she had made
    disclosures of attempts.

Defense counsel objected, and during a sidebar he alerted the district court he had never received any discovery related to a follow-up interview with JL. The district court indicated it intended to strike the statement from the record. Defense counsel then moved

2

for a mistrial. After dismissing the jury for the day and reviewing the testimony, the district court denied the motion for a mistrial, finding the defense raised the issue of potential acts against JL during the cross-examination of TL and IB. The district court ordered the State to produce a copy of the recording of JL's follow-up interview to the defense and ruled Mr. Lake would be allowed to call any witnesses he wished to after reviewing the interview.

[¶10] Defense counsel renewed his motion for a mistrial the following day. The district court denied the renewed motion for mistrial, and it decided the appropriate sanction was to strike from the record the portion of the forensic interviewer's testimony that referred to attempted sexual abuse and instruct the jury to disregard that testimony, without reminding the jury what the testimony was.[1]

[¶11] The jury found Mr. Lake guilty of all five counts. The district court sentenced Mr. Lake as follows: Count 1, 30-35 years in prison; Count 2, 10–15 years in prison, consecutive to Count 1, but concurrent to Count 3; Count 3, 10–15 years in prison, consecutive to Count 1, but concurrent to Count 2; Count 4, 10–15 years in prison, consecutive to Counts 2 and 3; and Count 5, 30–35 years in prison, consecutive to Count 4. This appeal timely followed.

## STANDARD OF REVIEW

[¶12] We review a district court's determination regarding the competence of a child witness for an abuse of discretion. *Young v. State*, 2018 WY 53, ¶ 14, 418 P.3d 224, 227 (Wyo. 2018). "Determining whether the trial court abused its discretion involves consideration of whether the court could reasonably conclude as it did, and whether it acted in an arbitrary and capricious manner." *Id.* (quoting *Triplett v. State,* 2017 WY 148, ¶ 23, 406 P.3d 1257, 1262 (Wyo. 2017)).

> [W]e do not presume to place ourselves in the shoes of the trial court in these cases by reading a cold record. The trial court sees the witness' facial expressions, hears inflections in her voice and watches her mannerisms during examination. These observations are a vital part of the ultimate ruling on competency.

*Id.*, 418 P.3d at 227–28 (quoting *Gruwell v. State,* 2011 WY 67, ¶ 25, 254 P.3d 223, 231 (Wyo. 2011)).

---

[1] Although the district court had not reviewed the video of JL's follow up interview at the time it made this ruling, it subsequently viewed the video and indicated on the record its review did not change any of its previous rulings.

[¶13] "Similarly, 'we review the denial of a motion for mistrial for an abuse of discretion.'" *King v. State*, 2023 WY 36, ¶ 19, 527 P.3d 1229, 1239 (Wyo. 2023) (quoting *Triplett*, 2017 WY 148, ¶ 24, 406 P.3d at 1262).

> In deciding whether to grant a mistrial, the district court is charged with determining whether the conduct was so prejudicial that justice could not be served by proceeding with trial. On review, we must resolve whether the district court abused its discretion in making its determination, and if the district court did abuse its discretion in denying a motion for a mistrial, whether that denial prejudiced the appellant.

*McGill v. State*, 2015 WY 132, ¶ 8, 357 P.3d 1140, 1144 (Wyo. 2015) (citation modified). Before determining whether the district court abused its discretion when it denied Mr. Lake's motion for a mistrial based on alleged discovery violations, we must determine whether the evidence withheld was material and whether the failure to disclose it to the defense affected the outcome of the trial. *Thomas v. State*, 2006 WY 34, ¶ 11, 131 P.3d 348, 352 (Wyo. 2006) (citing *Whitney v. State,* 2004 WY 118, ¶ 58, 99 P.3d 457, 476 (Wyo. 2004)). We review the question of whether the State violated Mr. Lake's constitutional rights de novo. *Mills v. State*, 2023 WY 76, ¶ 7, 533 P.3d 182, 187 (Wyo. 2023) (citing *Kovach v. State,* 2013 WY 46, ¶ 19, 299 P.3d 97, 104 (Wyo. 2013)).

## DISCUSSION

### I.  *Did the district court abuse its discretion when it found IB and TL were competent to testify?*

[¶14] During the competency hearing, after the district court finished questioning IB and TL, Mr. Lake asked the district court to make further inquiry into the "time period surrounding the occurrence" to determine if they had the ability to retain an independent recollection of the alleged abuse. The district court denied those requests. Mr. Lake asserts it was unreasonable for the district court to refuse his "extremely limited requests for further questioning of both witnesses." He claims further inquiry into the question of their ability to form an independent recollection of events "could have established or disestablished competency to testify . . . ." He asserts a competency finding was a threshold issue, and the ability to cross-examine the witnesses at trial was not a sufficient replacement for a proper determination of the witnesses' competency to testify in the first place. The State asserts the additional questions requested by Mr. Lake were unnecessary because they went to the witnesses' credibility rather than their competency.

[¶15] Rule 601 of the Wyoming Rules of Evidence (W.R.E.) states: "[e]very person is competent to be a witness except as otherwise provided in these rules." W.R.E. 601 (2025). Generally, "a witness is competent to testify if she can understand, receive, remember and

4

narrate impressions and is sensible to the obligations of the oath taken before testifying." *Young*, 2018 WY 53, ¶ 15, 418 P.3d at 228 (citation modified). "[A] witness's intelligence, not her age, [] determines whether she is competent to testify, and the child's statements need not be perfect for her to be considered competent." *Id.* (citations omitted). The Court does not look at any single statement in isolation but instead looks at "the child's entire testimony in determining whether the district court properly ruled she could testify." *Id.*

[¶16] Wyoming uses the five-part test first adopted in *Larsen v. State,* 686 P.2d 583, 585 (Wyo. 1984), to determine if a child witness is competent to testify. Under that test, the district court must determine whether the child has:

> (1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which she is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words her memory of the occurrence; and (5) the capacity to understand simple questions about it.

*Young*, ¶ 16, 418 P.3d at 228 (quoting *Larsen*, 686 P.2d at 585).

[¶17] Mr. Lake's argument involves the third *Larsen* factor, which we discussed in *Young*, ¶¶ 17–24, 418 P.3d at 228–30. We stated this factor "focuses on the mental abilities of the witness rather than the witness's recollection of specific events." *Id.* at ¶ 19, 418 P.3d at 229 (quoting *Gruwell*, 2011 WY 67, ¶ 21, 254 P.3d at 230). "The inability to remember specific matters does not mean a witness is not competent to testify, although it may affect her credibility as a witness." *Id.* "[C]ompetence is not the same as credibility." *Id.* "[C]oncerns about the witness's credibility [can] properly be tested on cross examination." *Griggs v. State*, 2016 WY 16, ¶ 29, 367 P.3d 1108, 1122 (Wyo. 2016).

[¶18] IB's and TL's testimony at the competency hearing established they had the mental ability to form an independent recollection of the abuse. TL remembered events from the relevant time period, including her birthday party, her Halloween costume, and what she received for Christmas. IB remembered she received a doll for Christmas, which she described in detail. Both girls knew what grades they were in at school currently and when the abuse happened, and they listed their teachers' names for both school years. They each named their favorite school subjects and televisions shows. Although there were certain details they could not remember, such as their address or how long they had lived there, those details went to their credibility, not their competency. *Young*, 2018 WY 53, ¶ 19, 418 P.3d at 229.

[¶19] Mr. Lake was able to cross-examine IB and TL at trial, which resulted in eliciting some conflicting details. For example, the girls gave inconsistent answers about who drew

5

the bath and who else was home when the alleged abuse took place. Mr. Lake used these inconsistencies in his closing argument to claim there was insufficient evidence to convict him of the charges.

[¶20] In this case, we are unable to find the district court abused its discretion in determining IB and TL were competent to testify. Considering the entirety of IB's and TL's testimony, we conclude the district court acted reasonably when it declined to ask further questions about other events that happened around the same time as the abuse and found the witnesses were competent to testify. The district court conducted the analysis required under *Larsen*, and the record supports the district court's conclusion both witnesses had a memory sufficient to retain an independent recollection of events.

### II. Did the district court abuse its discretion when it denied Mr. Lake's motions for a mistrial?

[¶21] During the investigation into the allegations made by IB and TL, JL was identified as another potential victim, and Mr. Lake's trial date was postponed while the State decided whether to bring additional charges relating to JL. After a follow-up interview with JL, the State received an email from the investigating detective indicating JL would only talk about Mr. Lake attempting to touch her. JL also said Mr. Lake would take the other girls into a room alone, saying he needed help with something. When Mr. Lake attempted this with JL, she knew what he was trying to do, and she would walk away. Because JL would not talk about what she had seen Mr. Lake do, the detective decided to close the case. Without reviewing the interview, the State decided there was not enough evidence to pursue charges. The State did not turn over the detective's email or JL's follow-up interview to Mr. Lake because it did not relate to the charges pertaining to IB and TL. Mr. Lake asserts the State's failure to disclose JL's follow-up interview violated its obligations under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), necessitating a mistrial.

[¶22] "Granting a mistrial is an extreme and drastic remedy that should be resorted to only in the face of an error so prejudicial that justice could not be served by proceeding with trial." *King*, 2023 WY 36, ¶ 22, 527 P.3d at 1239 (quoting *McGill*, 2015 WY 132, ¶ 11, 357 P.3d at 1145). "To determine whether an error is 'so prejudicial' as to warrant a mistrial, we consider the severity and pervasiveness of the error and the curative actions taken by the district court." *Id.* (quoting *McGill*, ¶ 12, 357 P.3d at 1145). "The trial court is in the best position to assess the prejudicial impact of the error." *Id.* (quoting *McGill*, ¶ 11, 357 P.3d at 1145).

[¶23] Under *Brady*, the State has an affirmative duty to learn about favorable evidence within its control and divulge such evidence to the defendant. *Mills*, 2023 WY 76, ¶ 8, 533 P.3d at 187 (citing *Lawson v. State*, 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010)). "To establish a *Brady* violation, the defendant must prove the State suppressed evidence,

the evidence was favorable to the defense, and the evidence was material because it is reasonably probable that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at ¶ 9, 533 P.3d at 187 (quoting *Pearson v. State*, 2017 WY 19, ¶ 36, 389 P.3d 794, 801–02 (Wyo. 2017)) (citation modified).

[¶24]  In *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972), the Supreme Court of the United States extended this obligation to learn about favorable evidence to include a requirement to disclose "evidence which would undermine the reliability of a witness on a matter important to the defendant's guilt or innocence, i.e., impeachment evidence." *Mills*, ¶ 9, 533 P.3d at 187.  We analyze a claim the State suppressed impeachment evidence under *Giglio* by using the *Brady* test. *Id.* (citing *United States v. Card*, 46 F. App'x 941, 947 (10th Cir. 2002)).

## A.  Was Evidence Suppressed by the State?

[¶25]  To establish the first element of a *Brady* violation, Mr. Lake must show the State suppressed potentially exculpatory evidence. *Mills*, 2023 WY 76, ¶ 11, 533 P.3d at 187–88.  "The essence of *Brady* is the discovery of information after the trial, which was known to the prosecution but unknown to the defense during the trial." *Id.*, 533 P.3d at 188 (quoting *Thomas*, 2006 WY 34, ¶ 16, 131 P.3d at 353).  "The delayed disclosure of *Brady* materials is not always grounds for reversal." *Thomas*, ¶ 16, 131 P.3d at 353 (citing *Whitney*, 2004 WY 118, ¶ 58, 99 P.3d at 476).

> As long as disclosure is made before it is too late for the defendant to make use of the evidence, due process is satisfied. ***Brady* is not violated when the material is available to the defendant during trial** . . . . Thus, where exculpatory evidence is discovered during the trial and defense counsel has the opportunity to use it in cross-examination, closing argument, or other parts of the defense case, courts generally do not find a due process violation.

*Id*. (citation modified) (emphasis added).

[¶26]  In the present case, there is no dispute the recording of JL's follow-up interview was made available to Mr. Lake on the second day of trial.  The district court also gave Mr. Lake the opportunity to call or re-call any witness he deemed appropriate after reviewing the video.  Mr. Lake could have used any evidence gleaned from the recording to re-cross-examine IB and TL, and he could have called JL as a witness.  Instead, he chose to exercise his right not to call any witnesses.

[¶27]  Mr. Lake failed to show the State suppressed evidence or violated his due process rights under the first prong of the *Brady* test. *See Thomas*, 2006 WY 34, ¶¶ 15–18, 131

P.3d at 353–54 (finding no *Brady* violation when the State disclosed favorable evidence to the defendant on the second and third days of trial). The evidence about which he asserts error was disclosed and made available to the defense during trial. He had the opportunity to use the late disclosed evidence in cross-examination, closing argument, and other parts of the defense case.

## B. Was the Evidence Favorable to Mr. Lake and Material to his Defense?

[¶28]   Although Mr. Lake failed to establish the first prong of the *Brady* test, we will also discuss whether he established the second prong, which requires him to establish the evidence was favorable and material to his defense. *See Mills*, 2023 WY 76, ¶ 9, 533 P.3d at 187 (quoting *Pearson,* 2017 WY 19, ¶ 36, 389 P.3d at 801–02). Favorable evidence under *Brady* and *Giglio* includes impeachment evidence. *Chauncey v. State*, 2006 WY 18, ¶ 13, 127 P.3d 18, 21 (Wyo. 2006) (quoting *Davis v. State,* 2002 WY 88, ¶ 18, 47 P.3d 981, 986 (Wyo. 2002)). The question in this case is whether the follow-up interview of JL should have been disclosed as favorable and material evidence because it had value as an impeachment tool. The critical issue is whether the information in the interview was material. *Id*. at ¶ 18, 127 P.3d at 23. Mr. Lake must show there is a "reasonable probability" of a different result had this evidence not been suppressed. *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S. Ct. 1555, 1566, 131 L. Ed. 2d 490 (1995)).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Id.*

[¶29]   Mr. Lake asserts JL's follow-up interview was material to his defense in two ways. First, it was unnoticed W.R.E. 404(b) evidence the defense needed to prepare for and be mindful of when questioning witnesses. Second, he asserts "these allegations also contradicted [JL's] own prior disclosures and the disclosures of the charged victims I.B. and T.L." Mr. Lake asserts the actions described by JL in the interview were "very specific" and were not corroborated or even mentioned by IB or TL.

[¶30]   The affidavit of probable cause filed with the Information in this case put Mr. Lake on notice that IB had made allegations he had also abused JL. Both IB and TL apparently made similar allegations in their forensic interviews because the defense asked them about those statements during cross-examination, even though allegations pertaining to JL were not mentioned by the State during direct examination. JL's interview contains numerous

8

inculpatory statements regarding Mr. Lake's alleged abuse of IB and TL. It also contains statements regarding his attempts to sexually abuse JL. JL also states IB told her: "You should watch out for your dad, he's touching me." JL thought the abuse was happening to TL too, even though TL never told her.

[¶31] Mr. Lake asserts he would have cross-examined IB and TL differently if he had seen JL's interview prior to trial. However, the only specific statement he references in his brief is JL's statement that IB told her: "You should watch out for your dad, he's touching me." Mr. Lake could have re-called IB to ask her about this statement, which may have impeached IB's testimony she had not told anyone about the abuse, assuming he could have overcome any hearsay or other objections to this evidence. However, IB also testified she did talk to TL and JL about the bathtub incident. Therefore, had IB been recalled, it is possible her testimony would not have been inconsistent with JL's statement in the interview. Moreover, while JL's statement may have potentially impeached IB's statement regarding whether she had told anyone about the abuse, JL's statement also corroborated other testimony regarding Mr. Lake's alleged sexual abuse of IB and TL.

[¶32] Further, IB and TL's credibility was impeached in other ways, such as by Mr. Lake pointing out the inconsistencies between their versions of the events in his closing argument. We have said "evidence which is 'at best cumulative' does not meet" the materiality standard that is necessary to render the verdict unworthy of confidence. *Chauncey*, 2006 WY 18, ¶ 21, 127 P.3d at 23–24 (quoting *Relish v. State,* 860 P.2d 455, 460 (Wyo. 1993)). We do not believe one additional piece of cumulative information from JL's interview makes the verdict in this case unworthy of confidence. *See id.* (holding where a witness was exhaustively impeached, one additional piece of impeachment evidence did not make the verdict unworthy of confidence).

[¶33] Although Mr. Lake asserts he would have cross-examined IB and TL differently, he fails to show how that change would have made a different result reasonably probable. The practical effect of an earlier disclosure would be to adopt the same trial strategy that resulted in Mr. Lake's conviction. The jury would still be faced with determining IB's and TL's credibility based on their testimony about what Mr. Lake did to them, not what the girls thought he might be doing to JL. The jury heard the girls' testimony about the events in question, and it heard Mr. Lake's arguments about why IB and TL were not credible. Having one additional potential impeachment statement regarding whether IB told anybody about the abuse, which also corroborated her testimony that the abuse occurred, neither makes a different result reasonably probable, nor does it undermine our confidence in the outcome of the trial.

[¶34] Mr. Lake failed to prove the State suppressed evidence that was favorable and material to his defense. Therefore, he failed to prove the State violated his constitutional rights under *Brady* and *Giglio*. Because there was no *Brady* violation, the district court had to determine if the forensic interviewer's statement indicating JL disclosed attempted

sexual abuse was so prejudicial that justice could not be served by continuing with the trial. *McGill*, 2015 WY 132, ¶ 12, 357 P.3d at 1145. The district court was in the best position to assess the prejudicial impact of this statement. *Salinas v. State*, 2016 WY 97, ¶ 17, 380 P.3d 647, 650 (Wyo. 2016). We find the district court reasonably concluded the forensic interviewer's statement—which was nonresponsive to the question posed by the State— was not so prejudicial as to warrant a mistrial. *See id.* (holding a single statement that was volunteered and unresponsive to the question asked was not so prejudicial as to warrant a mistrial). The district court took appropriate curative action by striking the response and giving a cautionary instruction to the jury. *Id.* (citing *McGill*, ¶ 12, 357 P.3d at 1145). "We have no reason to suppose that the jury did not follow the instruction, and we can therefore only believe it disregarded the statement." *Id.* The district court's denial of Mr. Lake's motions for a mistrial was reasonable, and it did not abuse its discretion.

## CONCLUSION

[¶35]   The district court did not abuse its discretion when it found the minor children were competent to testify. Mr. Lake failed to show the State violated its obligations under *Brady* and *Giglio* when it did not disclose JL's follow-up interview until the second day of trial. The single unresponsive statement from the forensic interviewer regarding disclosures of attempted sexual abuse in JL's follow-up interview was not so prejudicial as to warrant a mistrial, and the district court took appropriate curative action. The district court did not abuse its discretion when it denied Mr. Lake's motions for a mistrial. Affirmed.