2007 WY 24

**Steven Christopher MATTERN,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 05–218.

Supreme Court of Wyoming.

Feb. 13, 2007.

Representing Appellant: Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; Marion Yoder, Senior Assistant Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel. Argument by Ms. Yoder.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Dee Morgan, Senior Assistant Attorney General. Argument by Ms. Morgan.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] A jury found the appellant guilty of attempted first-degree murder, and the district court sentenced him to life in prison. This appeal raises questions concerning jury selection, uncharged misconduct evidence, the adequacy of the jury instructions, and the sufficiency of the evidence. We affirm.

## ISSUES [1]

■ [¶2] 1. Did the State engage in purposeful discrimination when it exercised peremptory challenges to exclude two Hispanics from the jury?

2. Was character evidence improperly admitted at trial?

3. Did the district court properly instruct the jury as to the elements of the crime of attempted first-degree murder?

4. Was there sufficient evidence for the jury to find the appellant guilty of attempted first-degree murder?

## FACTS

[¶3] The appellant and Jenny Abeyta lived together in Rawlins, Wyoming, for about two months before he moved out at her request after a dispute. On the night of September 10, 2004, the appellant went to Abeyta's house and asked her to join him at a bar later that night. She did not do so. Several hours later, the appellant and his brother, James Mattern, returned to Abeyta's house. Before getting out of his car, the appellant retrieved his single-action Colt .45 automatic pistol and hid it in his waistband. Inside the house were Abeyta, her two children, and her mother's boyfriend, Tim Snow.

[¶4] As he entered the house, the appellant was already angry that Abeyta had not come down to the bar.[2] He became more angry when he saw that Snow was there, because he thought Snow and Abeyta "did drugs" together and that Snow had "tried to hit on her" in the past. Almost immediately,

an argument erupted among the appellant, Abeyta, and Snow. It began with the Appellant and Abeyta shouting at one another, and escalated to include Snow when the appellant accused Snow of "saying something." The confrontation began in the bedroom, proceeded outside, where the appellant and Snow intended to fight at the appellant's suggestion, and then went back up the front steps to the front door. Snow retreated into the bedroom, at which time the appellant reached past Abeyta and shot Snow. The appellant and his brother fled the scene. Snow was taken by air ambulance to Casper for treatment. The appellant was arrested several weeks later in Tucson, Arizona.

## DISCUSSION

### Did the State engage in purposeful discrimination when it exercised peremptory challenges to exclude two Hispanics from the jury?

■ [¶5] We will begin this discussion with an analysis of the context in which peremptory challenges occur. All jury trials begin, of course, with the *voir dire* process, where jurors are examined by counsel for the following purposes:

> Pursuant to W.R.Cr.P. 24(c)(1), the purpose of voir dire is to choose jurors who will be fair and impartial:
>
> In Wyoming, the purpose of voir dire is to seek to establish grounds for challenge for cause; assess any individual bias as to each member of the panel; and to arrive at a determination of the

---

1. The appellant attempts to raise a fifth issue in his reply brief: whether the trial court committed plain error in not answering a jury question about the difference between first-degree and second-degree murder. The purpose of a reply brief is to allow the appellant to reply to new issues raised in the appellee's brief; not to raise new issues himself. *Budd–Falen Law Offices, P.C. v. Rocky Mountain Recovery, Inc.,* 2005 WY 77, ¶14, 114 P.3d 1284, 1288 (Wyo.2005); and *Siler v. State,* 2005 WY 73, ¶48, 115 P.3d 14, 38 (Wyo.2005). Here, the issue concerning the district court's reply to the jury question was not a new issue raised by the State, but was part of its response to the appellant's jury instruction and evidence sufficiency issues. Consequently, we will not address that issue separately.

2. Abeyta, Snow, and the appellant's brother all testified at trial. The appellant did not testify at trial, but a statement he made to the police when he was arrested was entered into evidence. The facts described herein are gleaned from the witnesses' separate accounts, which were similar in most respects, although not identical. A major disagreement was the point at which the appellant had drawn his pistol. Snow said that the appellant first took the gun out in the bedroom, while the appellant claimed not to have done so until they were outside and Snow hit the appellant's brother with something. Neither Abeyta nor the appellant's brother saw the gun inside the house. The jury, of course, was free to decide which version was the truth.

potential jurors' ability to decide a case fairly....

In accordance with the rule, voir dire is subject to the supervision and control of the trial judge. The rulings of the trial judge are given deference within the permissible bounds. The authority of the trial court is discretionary and "[t]he only inhibition regarding the discretion of the trial court is that it must be exercised subject to the essential demands of fairness." *Jahnke [v. State,* 682 P.2d 991,] 999 [(Wyo.1984)].

*Law v. State,* 2004 WY 111, ¶ 32, 98 P.3d 181, 192–93 (Wyo.2004) (*quoting Vit v. State,* 909 P.2d 953, 960 (Wyo.1996)).

[¶ 6] Wyo. Stat. Ann. § 7–11–105 (LexisNexis 2005) sets forth the limited bases upon which a venire member may be challenged for cause. In addition, Wyo. Stat. Ann. § 7–11–103(a) (LexisNexis 2005) and W.R.Cr.P. 24(d)(1) allow the State and each defendant in a non-capital felony criminal jury trial eight peremptory challenges. Traditionally, peremptory challenges could be exercised for any reason or for no reason:

Appellant acknowledges the holding in *Swain v. State of Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), to the effect that a defendant could not question a prosecutor's use of peremptory challenges in a particular case even if the peremptory challenge was allegedly used to discriminate against a particular group of persons. The court there said:

The essential nature of the peremptory challenge is that it is one exercised without a reason stated, without inquiry and without being subject to the court's control. *State v. Thompson,* 68 Ariz. 386, 206 P.2d 1037 (1949); *Lewis v. United States,* 146 U.S. 370, 378, 13 S.Ct. 136, 139, 36 L.Ed. 1011 [(1892)]. While challenges for cause permit rejection of jurors on a narrowly specified, provable and legally cognizable basis of partiality, the peremptory permits rejection for a real or imagined partiality that is less easily designated or demonstrable. *Hayes v. State of Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 [(1887)]. It is often exercised upon the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another,' *Lewis,* supra 146 U.S., at 376, 13 S.Ct., at 138, upon a juror's 'habits and associations,' *Hayes v. State of Missouri, supra,* 120 U.S., at 70, 7 S.Ct., at 351, or upon the feeling that 'the bare questioning [a juror's] indifference may sometimes provoke a resentment,' *Lewis,* supra, 146 U.S., at 376, 13 S.Ct., at 138. It is no less frequently exercised on grounds normally thought irrelevant to legal proceedings or official action, namely, the race, religion, nationality, occupation or affiliations of people summoned for jury duty.

*Evans v. State,* 653 P.2d 308, 309–10 (Wyo. 1982).

[¶ 7] The "any reason or no reason" rule came to an end, however, with the publication of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), *overruled in part by Powers v. Ohio,* 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). Batson, a black man, was convicted by an all-white jury, of certain theft offenses, after the prosecutor exercised his peremptory challenges to strike all four blacks from the venire. Relying upon *Strauder v. West Virginia,* 10 Otto 303, 100 U.S. 303, 25 L.Ed. 664 (1880), where the Supreme Court held that the Equal Protection Clause of the United States Constitution prohibits states from excluding blacks from service as jurors, the Court in *Batson* declared that the Equal Protection Clause likewise prohibits state prosecutors from peremptorily challenging members of the venire "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson,* 476 U.S. at 89, 106 S.Ct. at 1719.

[¶ 8] A *"Batson* challenge," as it has come to be called, follows a three-step process: First, the defendant must establish a *prima facie* showing of purposeful discrimination in the State's exercise of peremptory challenges. This *prima facie* showing may be met by combining a showing that the defendant is a member of a racial group capable of being singled out for differential

treatment, with proof of systematic exclusion of that racial group from juries over time, or with proof that the facts of the particular case show purposeful racial discrimination. *Id.,* 476 U.S. at 93–97, 106 S.Ct. at 1721–23. If the defendant makes such a *prima facie* showing, the State must then come forward with a "neutral explanation" for the exercise of its peremptory challenges. While such neutral explanation need not rise to the level of justifying a challenge for cause, it must go beyond the assumption that a juror of the same race as the defendant would not be impartial, and it must be related to the particular facts of the case. *Id.,* 476 U.S. at 97–98, 106 S.Ct. at 1723–24. As the third step in the process, the trial judge then determines whether the defendant has established purposeful discrimination. *Id.,* 476 U.S. at 98, 106 S.Ct. at 1724.

■■■ [¶ 9] The *Batson* principles have been refined over time. In *Hernandez v. New York,* 500 U.S. 352, 364–69, 111 S.Ct. 1859, 1868–71, 114 L.Ed.2d 395 (1991), for instance, the Supreme Court made clear that in reviewing a state trial court's findings on the issue of discriminatory intent, the deferential "clearly erroneous" standard would apply. Further, the Court re-emphasized that what *Batson* forbids is discriminatory *intent,* rather than discriminatory *effect. Id.,* 500 U.S. at 362, 111 S.Ct. at 1867. In *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995), the Court held that, at the second step in the *Batson* process, the State's explanation of its intent need not be persuasive, or even plausible. In other words, all that is required is an explanation that is facially valid. *Id.* It is not until the third step—where the judge is called upon to determine whether the defendant has carried his burden of proving purposeful discrimination—that the judge must choose whether to believe or disbelieve the State's explanation. That is because the ultimate burden of proof regarding motivation rests with, and never shifts from, the defendant. *Id.,* 514 U.S. at 768, 115 S.Ct. at 1771. Quite recently, in *Miller–El v. Dretke,* 545 U.S. 231, 241, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005), the Supreme Court gave further guidance by declaring that:

[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step.

[¶ 10] The Wyoming Supreme Court has, from time-to-time, been required to review *Batson* challenges. In *Bueno–Hernandez v. State,* 724 P.2d 1132 (Wyo.1986), *cert. denied,* 480 U.S. 907, 107 S.Ct. 1353, 94 L.Ed.2d 523 (1987), a Mexican national defendant moved for a mistrial on the ground that three panelists with Spanish-sounding surnames were peremptorily challenged by the State. This Court rejected the *Batson* challenge for two reasons: one, the record did not establish that the individuals were, indeed, "Mexican–Americans," and two, the prosecutor had offered race-neutral explanations for challenging the three venire members. *Id.* at 1133–35 (two of the panelists had been involved in litigation where prosecuting attorneys were on the other side, and the third was known to be "anti-law enforcement"). Similarly, in *Espinoza v. State,* 969 P.2d 542, 547 (Wyo. 1998), we concluded that the State's assertion that the two venire members with Hispanic surnames were peremptorily challenged because they knew Espinoza and because their children were friends with him, was a sufficiently race-neutral explanation to defeat a *Batson* challenge. Finally, in *Beartusk v. State,* 6 P.3d 138, 142–43 (Wyo.2000), we followed the lead of the United States Supreme Court in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), in extending the *Batson* principles to gender-based discrimination. We also recognized that Court's standard of review:

[T]hese are questions best left to the discretion of the trial judge, who can ... more reliably determine ... whether a lawyer is manufacturing pretextual excuses to conceal discrimination.... On appeal, a trial court's findings of fact after a *Batson* hearing on whether the State's strikes were taken for discriminatory reasons will be reversed only if clearly erroneous. *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991); *U.S. v. Johnson,* 941 F.2d 1102,

1108–09 (10th Cir.1991). When the trial judge accepted the explanations offered by the prosecution, he ratified the reasonability of those proffered explanations. We will not second guess the trial court's findings of fact in a *Batson* ruling absent clear error.

*Beartusk*, 6 P.3d at 143.

 [¶ 11] The appellant in the case *sub judice* is Hispanic. The State exercised two of its peremptory challenges to remove the only two Hispanics from the venire. After the final panel was selected in chambers, the following colloquy occurred:

THE COURT: Any objection to the jury panel, the alternate or the method of selection?

[DEFENSE COUNSEL]: Yes, Your Honor. I am going to make an objection to, I believe the State has purposely eliminated all of the Hispanic folks from the jury panel. We would object to the way the panel was comprised at this time.

THE COURT: Mr. [Prosecutor]?

[PROSECUTOR]: Your Honor, the reasons for excluding the only two Hispanics that I'm aware of on the panel, Pamela Sandoval and Beatrice Vasquez, is that both expressed that they knew witnesses. Ms. Sandoval also expressed that she has a doctor's appointment, that this may interfere with it as it goes on. Beatrice Vasquez indicated she knew at least one of our witnesses and I believe knew the Defendant, also.

THE COURT: Any further argument, [Defense Counsel]?

[DEFENSE COUNSEL]: Yes, Your Honor. There are lots of witnesses (sic) that indicated that they knew witnesses in this trial, and the State didn't eliminate very much of those. In fact, I don't believe the State eliminated any of them. So we'll continue with our objection.

THE COURT: The court finds that the State has expressed legitimate reasons for the peremptory challenges issued against Beatrice Vasquez and Pamela Sandoval and will overrule the objection from the Defense.

Anything else?

[DEFENSE COUNSEL]: No, Your Honor.

[¶ 12] Application of the *Batson* three-step analysis to these facts convinces us that the district court's findings were not clearly erroneous. By considering the State's stated justification for the way it exercised its peremptory challenges, the district court apparently treated defense counsel's objection as a *prima facie* showing of purposeful discrimination. We, however, are not so sure that such was the case. The mere challenge of jurors with Spanish-sounding surnames would not be sufficient to establish purposeful discrimination, and the record reflects— which means the district judge was aware— that the State also challenged a non-Hispanic juror who knew a witness.

 [¶ 13] Even if we assume that the appellant met his initial burden of showing a *prima facie* case of purposeful discrimination and get to the second *Batson* step, we agree with the district court that the State expressed a facially legitimate reason for exercising its peremptory challenges as it did. Furthermore, the district court's brief response to the appellant's objection includes, without directly stating it, the analysis that makes up *Batson's* third step. The district court concluded that the State did not purposefully discriminate against the Hispanic jurors as a group. The record supports that conclusion. The State challenged only five jurors: two non-Hispanics who had not indicated that they knew any witnesses, one non-Hispanic who indicated he knew Abeyta, and two Hispanics. One of the Hispanic jurors— Ms. Sandoval—knew one of the law enforcement witnesses, knew Abeyta's mother, and preferred not to miss an upcoming doctor's appointment for her first pregnancy checkup. The other Hispanic juror—Ms. Vasquez— knew Abeyta. Interestingly enough, by the time the State exercised its fifth peremptory challenge and began to pass, defense counsel had peremptorily challenged one juror who was related to one of the law enforcement witnesses, and one juror who knew Abeyta. At that point, five of the jurors who knew witnesses had been removed from the panel, and we cannot simply assume that the State

was acting with improper motivation in not removing more such jurors.[3]

### Was character evidence improperly admitted at trial?

 [¶ 14] Evidentiary rulings are reviewed for an abuse of discretion, which goes to the question of the reasonableness of the trial court's decision. *Barker v. State,* 2005 WY 20, ¶ 10, 106 P.3d 297, 299–300 (Wyo.2005). Where there was no objection to the evidence at trial, we review its admission under the plain error standard, which requires the appellant to show that a clear and unequivocal rule of law was violated in a clear and obvious way, resulting in the denial of a substantial right and material prejudice. *Gomez v. State,* 2003 WY 58, ¶ 4, 68 P.3d 1177, 1179 (Wyo.2003).

 [¶ 15] The appellant raises two claims under this issue. First, he argues that W.R.E. 404(a)[4] was violated when the following exchange occurred during defense counsel's cross-examination of the victim, Snow:

Q. Okay. Now, did you and [Abeyta] consume any methamphetamine together?
A. Not that night.
Q. Not that—Have you before?
A. Probably, yeah.
Q. Okay.
A. And [the appellant], actually [the appellant] had gave me some cocaine.

[¶ 16] Defense counsel did not object to this answer, so we must review it for plain error. We note first that, while the question and answer are clearly shown in the record, the portion of the transcript quoted above does not accurately reflect the context of the allegedly "non-responsive" answer. Rather than being an aberrant declaration, the statement actually appears in the midst of five pages of questioning of Snow by defense counsel about his drug use, including several questions about cocaine, and its comparison to methamphetamine. In that context, we cannot say that Snow's response was entirely non-responsive. In fact, the situation may be characterized as invited error. *See Fortner v. State,* 843 P.2d 1139, 1148 (Wyo.1992). Perhaps realizing that to be the case, defense counsel chose to pursue the matter in an attempt to discredit Snow. In light of this tactical choice, we certainly cannot fault the district court for failing *sua sponte* to interject its own objection to the testimony. Beyond that, the appellant has failed to show how the statement violated the admonition of W.R.E. 404(a) that evidence of a character trait not be admitted to prove that the appellant acted in conformity therewith on the occasion in question. Lastly, the appellant has not shown how he was prejudiced by this isolated comment.

[¶ 17] The appellant was arrested in Arizona a little more than two months after the incident underlying this case. After being advised by Arizona law enforcement officers of his constitutional rights as per the dictates of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the appellant described the incident in detail. During that interview, the appellant made several

---

3. We will also note in passing that defense counsel's three final peremptory challenges were all exercised against jurors who had stated that they knew various witnesses, meaning, of course, that the State had no reason or need to challenge those jurors. In total, three of the State's five exercised peremptory challenges and five of the appellant's seven exercised peremptory challenges were used against jurors who knew witnesses. Apparently, this issue was of particular concern to both sides.

4. W.R.E. 404(a) reads as follows:
 (a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

 (1) Character of Accused.—Evidence of a pertinent trait of his character offered by an accused, or by the prosecution to rebut the same;
 (2) Character of Victim.—Evidence of a pertinent trait of character of the victim of the crime offered by an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
 (3) Character of Witness.—Evidence of the character of a witness, as provided in Rules 607, 608, and 609.

statements revealing the fact that he had a prior criminal record. A tape of the interview was played for the jury, and the appellant now claims that introduction of the evidence of his prior record violated W.R.E. 404(b) [5] and W.R.E. 609 [6].

[¶ 18] The parties disagree what standard the court should apply in reviewing this issue because they disagree as to whether the appellant appropriately objected below to admission of the evidence. Consequently, we must reconstruct the status of this issue as it was presented to the district court. The court file reveals that the appellant filed a motion on May 10, 2005, demanding notice of any uncharged misconduct evidence the State intended to introduce. The State's response contained the following paragraph:

> The plaintiff has provided all the statements made by each of the defendants in this matter to both of the defendants through discovery. It is the intention of the plaintiff to use any or all of those statements, unless precluded by Court order to do so. [7]

[¶ 19] The same document contains the following paragraph, headed as shown:

> 5. Motion *In Limine* to WRE 609 Evidence:
>
> a. The defendants will be provided with evidence intended to be introduced under the provisions of WRE Rule 404(b) under separate cover. A hearing must be conducted on that matter and this can be used in conjunction therewith. The nature of the Menacing felony conviction of James Mattern tends to show absence

of mistake and identity, which permit introduction of the felony under Rule 404(b).

This paragraph is curious, for several reasons. First, only the appellant's brother, and not the appellant, filed a motion under W.R.E. 609. Second, this response to that motion deals only with W.R.E. 404(b). Third, the State indicates in the *response* that it intends to use *the brother's* menacing conviction to show absence of mistake and identity, but at the *hearing* on the motion, the State's position was as follows:

> [PROSECUTOR]: We were trying to get those separate convictions. That's what we just received Thursday from those. Those do show—As I say, they have not been provided yet. We have to make copies of all that and provide it to them. It does not have a report as to the similarities, but we do have a menacing charge with a deadly weapon against Steven Mattern and against James Mattern. They arise out of the same event, apparently, from the dates that were there.
>
> We intend to use them to show that there is a lack of mistake, knowledge on their part as to what occurs when you're threatening somebody with a deadly weapon. That's the intent of this. If they are saying, gee, this is an accident, which is one of the defenses that has been put out by Steven Mattern, at least in his statement that we have and we'll attempt to introduce at the time of trial.

[¶ 20] So, in response to James Mattern's W.R.E. 609 motion, the State described how it intended to use the appellant's prior con-

---

**5.** W.R.E. 404(b) reads as follows:
(b) *Other crimes, wrongs, or acts.*—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**6.** W.R.E. 609 reads in pertinent part as follows:
(a) *General rule.*—For the purpose of attacking the credibility of a witness,
(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one (1) year under the law under

which the witness was convicted, and evidence that an accused has been convicted of such a crime shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused; and
(2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.

**7.** The response refers to two defendants because the appellant's brother was scheduled to be tried at the same time as the appellant. He pled guilty, however, and testified for the State at the appellant's trial.

victions against him, using a W.R.E 404(b) analysis. The district court withheld ruling on the motion, indicating that it would take the matter under advisement and rule later on the application of W.R.E. 404(b) to the convictions. Later in the same hearing, however, the prosecutor once again addressed the statements made by the two brothers to the police, indicating that he intended to introduce them at trial as statements against their own interests.[8] The appellant's counsel responded as follows: "I wouldn't have any objection to that, if I could see the statements prior to trial so that I can object specifically to any statement which I think may be inappropriately being—or at least attempted to be admitted in the trial."

[¶ 21] At trial, video and audio tapes of the appellant's statement to the Tucson police were played for the jury, without objection by defense counsel. In fact, defense counsel stipulated to the tapes' authenticity and admissibility. Defense counsel's objection that transcripts of the tapes be provided to the jurors to "follow along" was overruled. Now, however, the appellant objects to the admission of certain specific statements he made during the recorded interview. Those specific comments, in context, were as follows:

MR. MATTERN: That's what I don't understand. They should have the gun. They should know everything.

DETECTIVE HOGAN: Well, I'm not saying they don't. I'm just asking.

MR. MATTERN: Yeah. I dropped it right there.

DETECTIVE HOGAN: Okay.

MR. MATTERN: Because I freaked, you know. I'm, like, shit, *I'm just getting off parole.*

. . . .

DETECTIVE LOPEZ: Why did you run?

MR. MATTERN: What else am I going to do?

DETECTIVE LOPEZ: Well, honestly. I—I just want to know your reasoning, your reasons.

MR. MATTERN: Because I—you know, I was, like, shit, man. I didn't know what to do. *I just got out of going—just got out—off parole,* so I was, like, shit.

DETECTIVE LOPEZ: What were you on parole for?

DETECTIVE HOGAN: Got scared, basically, right?

MR. MATTERN: Yeah. I mean, shit. I know I'm going down regardless.

DETECTIVE LOPEZ: *What were you on parole for?*

MR. MATTERN: *For theft and escape.*

. . . .

DETECTIVE LOPEZ: You weren't scared of him?

DETECTIVE HOGAN: Has he been in the joint before?

MR. MATTERN: Huh-uh.

DETECTIVE HOGAN: But you have; huh?

MR. MATTERN: *I've been to the joint.*

. . . .

DETECTIVE HOGAN: *How long were you in prison for?*

MR. MATTERN: *Four years.*

DETECTIVE HOGAN: Four years. In Wyoming?

MR. MATTERN: No. In Colorado.

. . . .

DETECTIVE LOPEZ: And that's why you ran, got rid of the clothes and stuff?

MR. MATTERN: Yeah. *Knew I was going back to the joint.*

. . . .

DETECTIVE HOGAN: Couldn't be traced to you, though, right, because you didn't buy it at a gun store; huh?

MR. MATTERN: Right.

DETECTIVE HOGAN: Have you had experience with that before or something?

MR. MATTERN: Uh-huh.

DETECTIVE HOGAN: Were you picked up for a gun violation?

8. W.R.E. 804(b)(3) excludes from the hearsay rule certain statements made against the declarant's own interests.

MR. MATTERN: *I've—I've been picked up on a menacing case before.*

DETECTIVE HOGAN: What's—what's that?

MR. MATTERN: *Brandishing a weapon.*

(Emphasis added.)

[¶ 22] The appellant's appellate argument concerning these statements is somewhat convoluted and, in the end, unpersuasive. First, he contends that this evidence constituted impeachment by evidence of conviction of a crime, and should have been reviewed by the district court under W.R.E. 609, which review would have included a balancing of probative value and prejudicial effect under W.R.E. 403.[9] Following that assertion, the appellant skips immediately to the proposition that the statements should have been analyzed under W.R.E. 404(b). In that regard, the appellant contends that he clearly objected to the State's use of uncharged misconduct evidence, and that he had no notice or opportunity to be heard as to these statements. Finally, he declares himself to have been prejudiced by admission of the evidence in the following fashion:

> Certainly, this evidence was prejudicial to Mr. Mattern. The jury was improperly allowed to hear about Mr. Mattern's prior convictions. Such character evidence is implicitly damaging to a criminal defendant; indeed, there would not be rules of evidence concerning character evidence if that were not so. Therefore, Mr. Mattern's conviction should be reversed, and his case remanded for new trial.

[¶ 23] The State counters these arguments from several directions. First, the State cites *Gompf v. State,* 2005 WY 112, ¶ 31, 120 P.3d 980, 988 (Wyo.2005), for the well-established principle that, so long as his constitutional rights appropriately have been explained to him, the custodial statements of a defendant may be used as evidence against him. Second, the State notes that admissions by a party-opponent are not hearsay, and are not, therefore, excludable on that basis. *See* W.R.E. 801(d)(2).[10] Third, the State finds W.R.E. 609 inapplicable because it is a rule designed to control the impeachment of witnesses through introduction of prior criminal convictions, and here, the appellant did not testify and was not, therefore, subject to such impeachment. Finally, the State cites *Hopkinson v. State,* 632 P.2d 79, 125–126 (Wyo.1981), for the proposition that a defendant's statements to an officer are an "admission" and do not, therefore, implicate W.R.E. 404.

[¶ 24] Our own assessment of this issue leads us to agree with the State's final conclusion, if not necessarily with the path it took to get there.[11] Our first observation is that the appellant did not preserve these issues with adequate objections below. There were pre-trial motions and pre-trial hearings involving W.R.E. 404 and 609, but, at trial, the appellant stipulated to the admission of the statement he made to the Tucson police. This has to have been a tactical decision. Given the fact that he did not testify, admission of his statement was the best way to present his version of the events to the jury without subjecting himself to cross-examination. As to the particular brief comments about parole and his prior conviction, those were made in an effort to explain to the police why he fled from Rawlins. Perhaps no objection was made at trial for the same purpose. Under all these circumstances, the record does not show that the district court committed a clear error of law,

---

9. W.R.E. 403 reads as follows:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

10. W.R.E. 801(d) reads in pertinent part as follows:

(d) *Statements which are not hearsay.*—A statement is not hearsay if:

 . . . .

(2) Admission by Party–Opponent.—The statement is offered against a party and is (A) his own statement, in either his individual or a representative capacity. . . .

11. The fact that a statement is not hearsay, for instance, does not insulate it from analysis under W.R.E. 404. Also, we do not find the officer's testimony in *Hopkinson* to be at all similar to the taped statement presented to the jury in the instant case.

or that the appellant was prejudiced by his decision to stipulate to admission of the entire statement.

### Did the district court properly instruct the jury as to the elements of the crime of attempted first-degree murder?

■ [¶ 25] The jury instructions in this case consisted mainly of pattern instructions that have been given to juries innumerable times in this State's history. Furthermore, not only did the appellant not object to the instructions as given, he actually proffered the instruction defining "premeditated" that he now attacks as being "misleading, incomplete, inadequate and confusing." And inexplicably, despite his failure to object below, the appellant fails to present to us a plain error analysis of this issue.

[¶ 26] We could decline even to consider the appellant's instruction arguments because of these procedural deficiencies. Given the seriousness of the offense and the fact that the appellant was sentenced to life imprisonment, however, and to avoid later charges of ineffective assistance of counsel in this regard, we will make one quick observation about the instructions that is dispositive of the appellant's primary complaint, which complaint is as follows:

> The "premeditation" instruction given to the jury was misleading, incomplete, inadequate and confusing, as it emphasized that premeditation implies an interval, however brief, between the formation of the intent or design to kill and the commission of the act which results in death, but did not inform the jury that Mr. Mattern also had to have *deliberated* upon the intent or design to kill, which cannot happen in "an interval, however brief." Neither did any other given jury instruction provide this information. Without jury instructions explaining deliberation to the jury, the typical premeditation instruction given in this

case results in blurring the lines and distinctions between the different degrees and kinds of murder."

(Emphasis in original.)

[¶ 27] As we read this passage, it appears that the appellant's complaint is that, even though the jury was instructed that first-degree murder requires premeditation in the form of an interval of time sufficient to form the intent to kill before doing the act of killing, the jury was not instructed that the appellant must actually have deliberated; that is, he thought about the idea of killing before doing the act. We reject this argument because the instruction that was given, Instruction No. 7, clearly made just that point:

> "Premeditated malice" means that *the defendant thought about and considered the idea of killing before the act which caused death was committed,* and that the act which caused death was done with intent to kill and without legal justification or excuse.

> Premeditated requires an interval sufficient to form the intent to kill before the commission of the act intended to result in death.

(Emphasis added.) We cannot comprehend how the idea of deliberation could be stated any more plainly for the jury.

### Was there sufficient evidence for the jury to find the appellant guilty of attempted first-degree murder?

■ [¶ 28] Defense counsel moved for a judgment of acquittal at the conclusion of the State's case, which motion was denied.[12] We review the denial of a motion for judgment of acquittal by examining and accepting as true the State's evidence, together with all reasonable inferences to be drawn therefrom, leaving out entirely any conflicting evidence. *Wise v. State,* 654 P.2d 116,

---

12. W.R.Cr.P. 29(a) reads as follows:
 (a) *At close of evidence.*—Motions for directed verdict are abolished and motions for judgment of acquittal shall be used in their place. The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information or citation after

the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses. If a defendant's motion for judgment of acquittal at the close of the evidence offered by the state is not granted, the defendant may offer evidence without having reserved the right.

117 (Wyo.1982). The question is whether there is sufficient evidence from which a reasonable jury could have found guilt beyond a reasonable doubt. *Hightower v. State,* 901 P.2d 397, 401 (Wyo.1995).

[¶ 29] The appellant argued at trial that the State proved neither premeditation nor malice, the former being an element of the charged crime of attempted first-degree murder, and the latter being an element of both attempted first-degree murder and the lesser-included offense of attempted second-degree murder. On appeal, he abandons any effort to argue that he did not act maliciously, adopting, instead, an argument that he did not act purposely or with premeditation. In his brief, the appellant begins his discussion of this issue by stating boldly that "there was a complete lack of any proof of premeditation or deliberation." Having reviewed the entire record, we find this conclusion to be nothing more than a bald assertion based upon the appellant's view of the evidence—a view obviously not shared by the jury or the trial court.

[¶ 30] The essence of the appellant's first argument is that the event occurred too quickly for him to have "thought about and considered the idea of killing," and that the circumstantial evidence was insufficient to prove that he engaged in such deliberation. We have already quoted in full the district court's instruction to the jury as to the definition of "premeditated malice." On appeal, we evaluate the evidence of premeditation as follows:

> We have taken this opportunity to carefully review our premeditation jurisprudence. We find that heretofore we have not identified and articulated a method for evaluating evidence of premeditation. To clarify what is required on appeal to sustain a conviction of first degree murder and to analyze the evidence presented in this instance, we adopt the three-part framework articulated by the California Supreme Court, applied in California and other jurisdictions. We offer the framework verbatim:
>
> > Evidence sufficient to sustain a finding of premeditation and deliberation "falls into three basic categories: (1) facts about * * * what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3) would * * * support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed'; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take [the] victim's life in a particular way for a 'reason' which the jury can reasonably infer from facts of type (1) or (2)."
>
> *People v. Crandell,* 46 Cal.3d 833, 760 P.2d 423, 441, 251 Cal.Rptr. 227 (1988) (quoting *People v. Anderson,* 70 Cal.2d 15, 447 P.2d 942, 949, 73 Cal.Rptr. 550, 557 (1968)).
>
> > [V]erdicts of first degree murder typically [are sustained] when there is evidence of all three types and otherwise require at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3).
>
> *People v. Anderson,* 70 Cal.2d 15, 447 P.2d at 949, 73 Cal.Rptr. at 557.

(Some citations omitted; emphasis in original.) *Bouwkamp v. State,* 833 P.2d 486, 494–95 (Wyo.1992). In *Hightower,* 901 P.2d at 403, we added the following:

> Persons convicted of premeditated murder often have questioned what amount of time is required in "thinking over" or "deliberating upon" for juries to find that sufficient premeditation existed. Our rule is:
>
> > Premeditation need not have existed for any given length of time before the act, it being sufficient that it existed at the time of the act; and the intent and the

act may be as instantaneous as successive thoughts. *Sandoval v. People*, 117 Colo. 588, 192 P.2d 423 (1948).

[¶ 31] Our analysis of the evidence in the instant case differs from the analysis just recited solely in that the appellant was convicted only of attempted first-degree murder, rather than first-degree murder. Under the circumstances of this case, the act that constituted the attempt was shooting Snow through the mouth, jaw, and neck. The evidence of the appellant's actions prior to that act was as follows: he became angry because Abeyta did not come to the bar and because Snow was at Abeyta's house; he returned to Abeyta's house, took his loaded handgun from his vehicle and hid it in his clothing; he accosted Abeyta and then Snow, engaging them in a violent argument; he brandished the gun inside the house while challenging Snow to go outside and fight; once outside, he again brandished the gun and, while so armed, chased Snow back into the house, reaching past Abeyta with the gun in hand; and because Snow had hit the appellant's brother in the head with something, the appellant intended to "make Snow bleed."

[¶ 32] As to the second type of evidence to be considered—that of the prior relationship between Snow and the appellant—the appellant did not argue self-defense, or any other legal justification or excuse, at trial. Beyond that, in his statement to the officers, in his opening statement, and in his closing argument, he indirectly admitted motive for the attempted murder by stressing his ill will and hostility toward Snow. Although defense counsel's purpose in making these admissions was to try to direct the jury toward a verdict of attempted voluntary manslaughter, the evidence actually showed that the appellant's intense dislike for Snow predated the incident.

[¶ 33] The final question is whether the State presented evidence about the nature of the act, itself, to sustain a jury conclusion that the appellant deliberately intended to kill Snow. While the use of a deadly weapon, alone, would not support such a conclusion, it was not unreasonable for the jury to conclude in this case that the manner in which the gun was used, when combined with all the other evidence, was sufficient. The appellant, with gun in hand, chased Snow up the stairs and back into the house. He then reached around Abeyta, who was attempting to block his entrance, pointed the gun in the direction Snow was fleeing, and pulled the trigger.

[¶ 34] The evidence of premeditation in this case was not just evidence of the passage of an interval of time. There was an interval of time that passed—sufficient time during which the appellant could deliberate—and the evidence of his conduct during that interval was sufficient for the jury to conclude that he did, indeed, deliberate. We will not substitute our judgment for that of the jury when there is sufficient evidence to support its factual determinations.

[¶ 35] The appellant's second sufficiency of the evidence argument is contained in this single paragraph of his Brief:

> In order to meet the elements of the crime of attempted first degree murder, the state had to prove a number of things. One of those things would be that Mr. Mattern acted "purposely" in shooting Mr. Snow. "Purposely" was defined for the jury as "that the act that caused the death was intentionally done." There is no evidence in this record that Mr. Mattern purposely pointed the gun at Mr. Snow, nor that Mr. Mattern purposely pulled the trigger and shot Mr. Snow. It cannot be inferred, from the mere possession and display of a weapon, that one has acted "purposely" in shooting another.

(Citation omitted.)

[¶ 36] We will make two observations about this argument. First, it is basically inconsistent with the appellant's position at trial, where defense counsel repeatedly argued that the appellant should be convicted of attempted voluntary manslaughter, rather than attempted first-degree murder. Defense counsel admitted that the appellant had acted voluntarily, but contended that he did not have the specific intent to kill. The problem with now arguing that the appellant did not act "purposely" is that we have previously equated the words "voluntarily" and "purposely" in the murder statutes as both

connoting an intentional act, rather than an accidental one. *State v. Keffer,* 860 P.2d 1118, 1138 (Wyo.1993).

[¶ 37] Our second observation is that what is really happening here is that the appellant is re-arguing the facts. His contention is, in effect, that the evidence was sufficient for the jury to find that he intentionally swung the gun at Snow, but not sufficient to find that he intentionally pulled the trigger. Once again, our job is not to re-weigh the evidence. Our job is only to determine whether sufficient evidence was presented for reasonable jurors to determine beyond a reasonable doubt that the appellant intentionally shot Snow. The jury was given a choice between two versions of the facts: the appellant intentionally swung the gun at Snow and it accidentally went off, or the appellant intentionally shot Snow. The jury chose the latter version.

[¶ 38] We need not repeat in detail the evidence already outlined hereinabove. Suffice it to say that, viewed in the light most favorable to the State, the evidence showed that the appellant chased Snow into the house and reached around Abeyta with the gun. Given the fact that Snow was, in fact, shot, the gun must have been pointed in Snow's direction, and must have been held so that it could be fired, rather than being held as a club. In the context of all the other facts, that was sufficient evidence from which the jury could draw the conclusion that the appellant intentionally shot Snow.

## CONCLUSION

[¶ 39] The district court did not err in denying the appellant's *Batson* challenge or in denying the appellant's motion for judgment of acquittal. The jury was properly instructed as to the elements of the crime of attempted first-degree murder, and the State produced sufficient evidence for reasonable jurors to determine beyond a reasonable doubt that the appellant was guilty of that crime. Finally, no character evidence was improperly admitted.

[¶ 40] Affirmed.