# IN THE SUPREME COURT, STATE OF WYOMING

# 2017 WY 19

## OCTOBER TERM, A.D. 2016

_____February 28, 2017_____

JAMES E. PEARSON,

Appellant
(Defendant),

v.                                                          S-16-0055

THE STATE OF WYOMING,

Appellee
(Plaintiff).

### *Appeal from the District Court of Campbell County*
The Honorable Thomas W. Rumpke, Judge

*Representing Appellant:*

> Office of the Public Defender:  Diane M. Lozano, State Public Defender; Tina N. Olson, Chief Appellate Counsel; David E. Westling, Senior Assistant Appellate Counsel.  Argument by Mr. Westling.

*Representing Appellee:*

> Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Christyne Martens, Senior Assistant Attorney General; D. David DeWald, Senior Assistant Attorney General.  Argument by Mr. DeWald.

*Before BURKE, C.J., and HILL, DAVIS, FOX, and KAUTZ, JJ.*

**NOTICE:  This opinion is subject to formal revision before publication in Pacific Reporter Third.  Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of typographical or other formal errors so correction may be made before final publication in the permanent volume.**

**KAUTZ**, Justice.

[¶1]   James E. Pearson was convicted after a jury trial of one count of aggravated arson and one count of attempted first degree murder for starting a fire in a motel hallway outside the victim's room.  He claims the evidence was insufficient for the jury to conclude that he had the specific intent to kill the victim and that his due process rights were violated when the district court allowed the State to call a witness to testify after failing to timely disclose agreements between the witness and the State.

[¶2]   We affirm.

## ISSUES

[¶3]   Mr. Pearson presents the following issues on appeal:

>    I.    Did the trial court err when it failed to grant a motion for judgment of acquittal in regard to the charge of attempted first degree murder in that there was no evidence of a specific intent to kill a specified human being?

>    II.   Did the [trial] court err by refusing to exclude a witness for whom prior plea agreements had not been disclosed despite demand for the same, thereby failing to address prosecutorial misconduct and the violation of Mr. Pearson's due process rights afforded by *Giglio v. United States* and *Brady v. Maryland?*

The State articulates similar issues, although phrased in greater detail.

## FACTS

[¶4]   On September 6, 2014, Mr. Pearson traveled from Casper to Gillette, Wyoming to see Autumn Evans, with whom he had a sexual relationship.  He picked her up from Room 315 at the Rodeway Inn and rented a room at the Super 8 Motel.  Mr. Pearson drove an uncommon automobile, a pearl colored Chrysler 300 with a distinctive grill and rims.  This unique vehicle was later identified at significant times and places around Gillette.

[¶5]   Mr. Pearson gave Ms. Evans some methamphetamine and she was supposed to sell it to someone at a bar.  She did not return from the bar, so Mr. Pearson went in looking for her and was told that she had not been there.  He then attempted to locate her at the Super 8 and Rodeway Inn but did not find her.  Ms. Evans was actually in Room 315 of

1

the Rodeway Inn when he came to the door looking for her, but she instructed a man who was in the room with her, Cameron Means, to tell Mr. Pearson that she was not there. She hid on the floor behind the bed while Mr. Means spoke to Mr. Pearson. Mr. Pearson told Mr. Means he was looking for Ms. Evans because she needed to pay for the methamphetamine.

[¶6]    At approximately 1:09 a.m. on September 7, 2014, Mr. Pearson purchased gasoline. A car consistent with his was seen on video surveillance cameras near the Rodeway Inn at approximately 1:24 a.m. Jolene Boos testified that she was outside the motel smoking when Mr. Pearson pulled up in his car and got out. He was carrying an object that she could not see very well and asked if "Autumn was home." Ms. Boos did not respond to his question. Mr. Pearson entered the motel, and shortly thereafter, she saw him look down at her from the third floor stairwell window. Ms. Boos testified that she could not remember the exact time she saw Mr. Pearson, but within half an hour after seeing him, she heard "some commotion." She looked out and saw that someone had jumped out of a window and landed on top of a vehicle. She then realized the motel was on fire. The fire was reported at approximately 1:38 a.m.

[¶7]    The third floor of the motel was badly damaged. Ms. Evans was not injured in the fire, but her boyfriend, Jeremy Duncan, suffered very serious injuries when he fell or jumped from the third floor. Other occupants of the motel were also injured in the fire. Fire investigators determined that the fire had been set deliberately outside of Room 315 using gasoline as an accelerant. A patrol car video camera and cell phone location records indicated that Mr. Pearson left town just before the fire was reported.

[¶8]    The State charged Mr. Pearson with one count of aggravated arson and one count of attempted first degree murder of Ms. Evans. His jury trial began on Monday, August 17, 2015, and ended on August 20, 2015. The Friday before trial, the State entered into an agreement with Cameron Means giving him immunity from prosecution for any narcotics-related crimes he would reveal during his testimony. At 6:30 a.m. on the first day of trial, the prosecutor notified defense counsel of the immunity agreement and a plea agreement with Mr. Means in a different case. Defense counsel objected, claiming that, under *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) and *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972), the State should be prohibited from calling Mr. Means to testify because it had violated Mr. Pearson's right to due process by not disclosing the agreements sooner.

[¶9]    The district court expressed concern over the late notification, but ultimately allowed Mr. Means to testify. It determined that the State had not violated *Brady* and *Giglio* because the defense would have the opportunity to use the information about Mr. Means' agreements with the State at trial. The jury returned guilty verdicts on both counts, and the district court sentenced Mr. Pearson to serve twenty-four to twenty-eight years in prison on the aggravated arson conviction and life without the possibility of

2

parole on the attempted first degree murder conviction. He filed a timely notice of appeal.

## DISCUSSION

### *1. Sufficiency of the Evidence on Attempted First Degree Murder*

[¶10] Mr. Pearson claims the district court should have granted his motion for judgment of acquittal on the attempted first degree murder charge because there was insufficient evidence that he specifically intended to kill Ms. Evans.

> In reviewing the denial of a motion for judgment of acquittal, we examine and accept as true the evidence of the prosecution together with all logical and reasonable inferences to be drawn therefrom, leaving out entirely the evidence of the defendant in conflict therewith.
>
> A motion for judgment of acquittal is to be granted only when the evidence is such that a reasonable juror must have a reasonable doubt as to the existence of any of the essential elements of the crime. Or, stated another way, if there is [sufficient] evidence to sustain a conviction of the crime, the motion should not be granted. This standard applies whether the supporting evidence is direct or circumstantial.
>
> *Butcher v. State,* 2005 WY 146, ¶ 11, 123 P.3d 543, 548 (Wyo. 2005).

*Bruce v. State,* 2015 WY 46, ¶ 52, 346 P.3d 909, 926 (Wyo. 2015). In other words, "[o]ur duty is to determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." *Wilkerson v. State,* 2014 WY 136, ¶ 28, 336 P.3d 1188, 1200 (Wyo. 2014) (citations omitted).

[¶11] Mr. Pearson was convicted of attempted first degree murder. Wyo. Stat. Ann. § 6-2-101 (LexisNexis 2015) defines first degree murder, in relevant part, as: "(a) Whoever purposely and with premeditated malice . . . kills any human being is guilty of murder in the first degree." Wyo. Stat. Ann. § 6-1-301 (LexisNexis 2015) defines attempt, for our purposes, as:

> (a) A person is guilty of an attempt to commit a crime if:
>      (i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime.

3

A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime[.]

[¶12]   The district court instructed the jury as follows:

## JURY INSTRUCTION NO. 16

1.    On or about the 7th day of September, 2014,
2.    In Campbell County, Wyoming,
3.    The Defendant, James E. Pearson,
4.    Purposely,
5.    With premeditated malice, attempted to kill a human being, Autumn Evans,
6.    With the intent to commit the crime of Murder in the First Degree, and
7.    Did an act which was a substantial step toward commission [of] the crime of First Degree Murder.

## JURY INSTRUCTION NO. 19

Whoever purposely and with premeditated malice kills any human being is guilty of murder in the first degree.

[¶13]   The court further instructed the jury that "'purposely' means intentionally" and "'[p]remeditated malice' means that the Defendant thought about and considered the idea of killing before the act which caused death was committed, and that the act which caused death was done with intent to kill and without legal justification or excuse." As to the attempt aspect of the crime, the district court instructed the jury consistent with § 6-1-301(a)(i) that "a 'substantial step' is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime."

[¶14]   Mr. Pearson does not contest the jury instructions and admits that setting the fire was a substantial step toward commission of attempted first degree murder. He claims, however, that there was insufficient evidence that he acted with specific intent to kill Ms. Evans. Relying on *Elfbrandt v. Russell,* 397 P.2d 944 (Ariz. 1964),[1] Mr. Pearson asserts that evidence of the "substantial step" (starting the fire) cannot be used to establish that he specifically intended to kill Ms. Evans.

---

[1] The United States Supreme Court reversed the Arizona Supreme Court's decision on other grounds in *Elfbrandt v. Russell,* 384 U.S. 11, 86 S. Ct. 1238, 16 L. Ed. 2d 321 (1966).

[¶15] *Elfbrandt* presented an unusual factual and procedural scenario. Ms. Elfbrandt was a public school teacher and she refused to take a statutorily required "loyalty oath" promising not to knowingly or willfully engage in actions in an attempt to overthrow the government by force or violence, be a member of an organization with that purpose, or be a member of the communist party. The commission of any prohibited act after taking the oath was a felony. *Id.* at 946-47. In determining whether the statute was constitutional, the Arizona Supreme Court stated that the crime of committing or aiding in the commission of an act in an attempt to overthrow the government could only be accomplished if the defendant had the specific intent to overthrow and committed an overt act in furtherance of that objective. *Id.* at 947-48. *Elfbrandt* stated:

> The overt act or the aiding therein must be with actual intent to accomplish the result forbidden, *State v. Mandel*, 78 Ariz. 226, 278 P.2d 413, and a specific intent to overthrow [the government] must exist. **It must be an intent in fact which cannot be implied or presumed and must be proved by evidence or facts other than those establishing the overt act.** Cf. *People v. Snyder*, 15 Cal.2d 706, 104 P.2d 639.

*Id.* at 948 (emphasis added). Mr. Pearson apparently interprets the emphasized language to mean that none of the evidence of the substantial step (arson) can be used to establish his specific intent to kill Ms. Evans.

[¶16] The Arizona Supreme Court did not actually apply the statement in *Elfbrandt* because it was not presented with a challenge to the sufficiency of the evidence to support a conviction for an attempted crime. The Arizona court did not present any logical analysis or practical examples to support its statement that evidence of an actor's substantial step (overt act) taken as part of an attempt to commit a crime cannot also be evidence of the actor's intent. We can think of no such logic or examples. Practically, one is left to wonder how to separate the overt act evidence from the specific intent evidence. An Arizona court of appeals seemed to grapple with that exact question in *State v. Lenahan,* 471 P.2d 748, 752 (Ariz. Ct. App. 1970), overruled on other grounds by *State v. Sample,* 489 P.2d 44 (Ariz. 1971):

> The Arizona rule as to attempted crimes is clear. An attempt must be proven as to both the overt act and the intent. And the intent must be proven by evidence of facts other than those of the overt act. *Elfbrandt v. Russell*, 97 Ariz. 140, 397 P.2d 944 (1964). **Just what other facts there might be is the question.**

(emphasis added). It proceeded to consider the entire factual scenario (including the evidence of the overt act of shooting the victim) in determining whether there was

5

sufficient evidence that the defendant acted with the specific intent to kill. The appellate court endorsed the trial court's statement that the defendant's "overt acts with a gun indicat[ed] that she had the intent to kill." *Id.* at 753.

[¶17]  Furthermore, the California case cited by *Elfbrandt* does not say that evidence of the overt act cannot be used to establish the defendant's specific intent. *People v. Snyder,* 104 P.2d 639, 639 (Cal. 1940), stated that the trial court erred by instructing the jury in an attempted murder case "that a person is presumed to intend to do that which he voluntarily and wil[l]fully does in fact do, and is also presumed to intend all the natural, probable and usual consequences of his acts." The California court held that, in order to convict on the charge of attempted murder, the state had to prove the defendant acted with the specific intent to kill and its burden could not be fulfilled with a presumption. *Id.* at 639-40.

[¶18]  We read that portion of *Snyder* to mean that a specific intent crime cannot be proven with a general intent standard.[2] We have said essentially the same thing:

> In *Fuller* [*v. State,* 568 P.2d 900, 903–904 (Wyo. 1977) ], we explained that, although the law presumes an individual to generally intend the natural consequences of his actions, it will not presume that he specifically intended any particular consequence. That is, a mere showing that certain conduct occurred which produced a particular result is legally sufficient to establish the actor's general intent. Thus, we explained that the bare fact of assaultive behavior will not give rise to a ***presumption*** that an assailant had the specific intent to cause any particular harm.

*Garcia v. State,* 777 P.2d 1091, 1095 (Wyo. 1989) (emphasis in original). *See also Leavitt v. State,* 2011 WY 11, ¶ 10, 245 P.3d 831, 833 (Wyo. 2011).

[¶19]  In this case, there is no concern that the jury applied an improper presumption to find that Mr. Pearson intended to kill Ms. Evans. The district court did not instruct the jury on the general intent standard or that it should presume that Mr. Pearson harbored the specific intent to kill Ms. Evans if it found that he set the fire. Instead, it properly instructed the jury that, in order to find Mr. Pearson guilty of attempted first degree murder, the State had to prove that Mr. Pearson committed an act which was a substantial step toward commission of the crime of first degree murder and he intended to kill Ms. Evans.

---

[2] This decision should not be read as approving other aspects of *Snyder*. In particular, we offer no opinion on the court's ruling that the erroneous instruction could not be cured by other proper instructions in the jury charge. *Id.* at 640-41.

[¶20] Our statutes and precedent explain the relationship between the specific intent and substantial step elements of attempt. Although both elements must be proven to find a defendant guilty of attempted first degree murder, they are related. In fact, the purpose of requiring proof of a substantial step is to show that the defendant engaged in conduct which showed the firmness of his intention to complete the crime. *See* § 6-1-301; *Gentilini v. State,* 2010 WY 74, ¶ 11, 231 P.3d 1280, 1283-84 (Wyo. 2010) (describing a substantial step as "an act in furtherance of the intent to commit a crime."). Given the relationship between the elements, it would make no sense to require separate evidence of each.

¶21] We have also recognized the importance of the context of a defendant's actions in determining his intent.

> [S]pecific intent may be properly proven by reasonable inferences from the character of such acts and their surrounding circumstances. In particular, the specifics of a defendant's conduct and other circumstantial evidence may permit the jury to infer that he acted with the specific intent to cause [the prohibited result].

*Garcia,* 777 P.2d at 1095 (citations and emphasis omitted.) *See also Leavitt,* ¶ 11, 245 P.3d at 833 (stating "[t]he State may prove specific intent by permissible means of inference from circumstantial evidence."). Wyoming's law is consistent with many other jurisdictions, which hold that "an intent to commit murder may be inferred . . . from the character of the assault, the use of a deadly weapon, and other circumstances." Jeffrey F. Ghent, *What Constitutes Attempted Murder*, 54 A.L.R.3d 612, § 12[a] (1973, 2017).

[¶22] In *Ken v. State,* 2011 WY 167, ¶¶ 20-22, 267 P.3d 567, 572-73 (Wyo. 2011), we reviewed the evidence of the circumstances surrounding Mr. Ken's act of shooting at the victim to determine whether there was sufficient evidence for the jury to find him guilty of attempted first degree murder. We ruled:

> Accepting this evidence as true, and refraining from substituting our judgment for that of the jury, we conclude the jury reasonably could have concluded that Mr. Ken was angry, retrieved the gun and purposely aimed it at Mr. Menard. The jury also could reasonably have concluded that Mr. Ken fired the gun at Mr. Menard twice with the intent of killing him but, in the excitement of the moment, missed his target and hit the apartments off to the right of Mr. Menard.

7

*Id.,* ¶ 22, 267 P.3d at 573. This analysis clearly shows that the actual assaultive behavior (aiming and shooting the gun) was both evidence of a substantial step and Mr. Ken's specific intent to kill.

[¶23] *Mattern v. State,* 2007 WY 24, ¶ 33, 151 P.3d 1116, 1130 (Wyo. 2007) also shows the close relationship between the defendant's specific intent to kill and his conduct in furtherance of that intention:

> The final question is whether the State presented evidence about the nature of the act, itself, to sustain a jury conclusion that the appellant deliberately intended to kill Snow. . . .[I]t was not unreasonable for the jury to conclude in this case that the manner in which the gun was used, when combined with all the other evidence, was sufficient. The appellant, with gun in hand, chased Snow up the stairs and back into the house. He then reached around Abeyta, who was attempting to block his entrance, pointed the gun in the direction Snow was fleeing, and pulled the trigger.

*See also Gentilini,* ¶¶ 12-13, 231 P.3d at 1284 (considering evidence of substantial step and specific intent together); *Johnson v. State,* 2015 WY 118, ¶¶ 22-24, 356 P.3d 767, 773 (Wyo. 2015) (considering, in an attempted first degree murder case, evidence of circumstances of assault in determining whether the requisite intent had been proven).

[¶24] With these principles in mind, we turn to the evidence presented in this case. Mr. Pearson does not challenge the jury's conclusion that he set the fire but claims the evidence did not demonstrate that he intended to kill Ms. Evans. Ms. Evans died of unrelated causes before Mr. Pearson's trial; therefore, the State was unable to present her testimony about that night. Mr. Pearson argues that, on the evidence presented, the jury could not have reasonably found that he specifically intended to kill Ms. Evans because he did not threaten her and, unlike in other attempted murder cases, he did not use a deadly weapon. While threats and use of a deadly weapon are certainly evidence that can show the defendant had the specific intent to kill, neither is mandatory. *See, e.g.,* *Gentilini,* ¶ 13, 231 P.3d at 1284 (defendant threatened to kill the victim); *Ken,* ¶¶ 20-22, 267 P.3d at 572-73 (defendant fired a gun at the victim). Instead, as we said earlier, the totality of the circumstances is considered in determining whether the State proved the specific intent element of the crime. We conclude that the trial evidence, when viewed in the light most favorable to the jury's verdict, establishes that Mr. Pearson intended to kill Ms. Evans when he set the fire.

[¶25] On the evening of September 6, 2014, Mr. Pearson picked Ms. Evans up from the Rodeway Inn, and they went to the Super 8, where they rented a room. Mr. Pearson told the police that he gave Ms. Evans some methamphetamine and she was supposed to go

into a bar to try to sell it, but she did not return with the drugs or money. He wanted to be paid for the methamphetamine and searched for her at the Super 8 and Room 315 at the Rodeway Inn, where he knew she had been staying.

[¶26] Cameron Means testified that he was in Room 315 when Mr. Pearson came to the door looking for Ms. Evans. He answered the door and told Mr. Pearson that Ms. Evans was not there, even though she was hiding on the floor behind the bed. Although he was polite, Mr. Pearson was agitated and tried to look over Mr. Means into the room. Another witness testified that Mr. Pearson appeared frantic during his search for Ms. Evans. He told police that he was angry because Ms. Evans had stolen methamphetamine from him.

[¶27] Video surveillance and a gas receipt showed that, at approximately 1:09 a.m. on September 7, 2014, Mr. Pearson purchased gasoline. Jolene Boos testified that she was outside the back door of the Rodeway Inn shortly before the fire started and saw Mr. Pearson drive into the motel parking lot and park. Surveillance video confirmed that a car matching the description of Mr. Pearson's was near the Rodeway Inn at 1:24 a.m. He got out of the car carrying a "reddish orange" object that Ms. Boos could not fully see and asked her whether "Autumn was home." He went into the motel and looked down at Ms. Boos from the third floor stairwell window. The fire was reported at approximately 1:38 a.m.

[¶28] During the fire investigation, law enforcement recovered a burnt metal fuel can from the hallway outside of Ms. Evans' room. A dog trained to detect accelerants positively identified several burned areas containing accelerant traces on the third floor. Chemical testing on one sample retrieved from the area confirmed the presence of gasoline. The fire investigators determined that the fire had been deliberately set just outside Room 315, where Mr. Pearson knew Ms. Evans had been staying.

[¶29] Ms. Evans' room was on the third floor of the motel and, because the fire was directly outside of her room, there was no safe means of egress. In addition, the fire was set at a time when people are generally assumed to be sleeping and less able to protect themselves against the danger of a fire. The third floor of the motel suffered extensive damage, and, although Ms. Evans was not injured, other occupants of the motel, including her boyfriend who shared the room, were. Surveillance cameras and cell phone location records showed that Mr. Pearson left Gillette just before the fire was reported.

[¶30] Other jurisdictions have upheld attempted first degree murder convictions based upon arson. *See* Jeffrey F. Ghent, *What Constitutes Attempted Murder*, 54 A.L.R.3d 612, § 29 and cases cited therein. In *State v. Abdullah,* 348 P.3d 1 (Idaho 2015), the Idaho Supreme Court upheld the defendant's convictions for three counts of attempted first degree murder because he set fire to a dwelling with three children sleeping inside. In *Abdullah,* like in this case, there was no evidence that the defendant used a deadly

9

weapon or threatened the children. However, the evidence that he set fire to the house while the children were sleeping inside was sufficient for a reasonable jury to conclude that he intended for the children to "die in the burning home." *Id.* at 44.

[¶31]  Like in *Abdullah,* there was no evidence that Mr. Pearson threatened Ms. Evans or used a deadly weapon. However, the evidence showed that Mr. Pearson was looking for Ms. Evans right before the fire started. He set the fire with an accelerant in the middle of the night directly outside of her third floor motel room, from which she had no clear means of escape. That combined with the evidence that he was angry at Ms. Evans and left town immediately after starting the fire was sufficient for a reasonable jury to conclude that he intended to kill her.

### 2.  *Failure to Disclose Agreements with Witness in a Timely Fashion*

[¶32]  Mr. Pearson claims the prosecutor committed misconduct and violated his right to due process of law, as set out in *Brady,* 373 U.S. 83, 83 S. Ct. 1194 and *Giglio*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, by failing to timely disclose that it had entered into agreements with Mr. Means. Because Mr. Pearson asserts that the State violated his constitutional rights, our standard for review is *de novo*. *Lawson v. State,* 2010 WY 145, ¶ 19, 242 P.3d 993, 1000 (Wyo. 2010).

[¶33]  Prior to trial, defense counsel filed a "Demand for Discovery Pursuant to Brady v. Maryland" and a "Motion to Compel Disclosure of Plea Bargain or Existence of Promises of Immunity, Leniency or Preferential Treatment or Other Agreements with the State[']s Witnesses (Giglio Information)." Mr. Means was subpoenaed by the State to appear as a witness at Mr. Pearson's trial. Mr. Means was in police custody and receiving treatment in Casper, so the State arranged for him to be transported to Gillette prior to the trial. On Friday, August 14, 2015, the prosecutor met with Mr. Means and his attorney at the Campbell County Detention Center. Mr. Means was concerned about testifying at Mr. Pearson's trial because he had consumed and given away methamphetamine the night of the fire and feared being charged with crimes associated with that conduct. At approximately 4:00 p.m. on Friday, the State agreed to give Mr. Means immunity for his use and distribution of the methamphetamine on that night in exchange for his testimony at Mr. Pearson's trial.

[¶34]  At 6:30 a.m. on the first day of trial, Monday, August 17, 2015, the State disclosed to defense counsel that the State had granted Mr. Means immunity for his testimony. At the same time, the State informed defense counsel that while the case against Mr. Pearson was pending, Mr. Means received first offender status under Wyo. Stat. Ann. § 7-13-301 (LexisNexis 2015) as part of a plea agreement in another matter. Mr. Pearson moved for an order in limine to prohibit Mr. Means from testifying because of the late disclosure of the agreements. The district court held a hearing on Mr. Pearson's motion before Mr. Means testified. Although it expressed concern over the late disclosure and ordered the

State to produce the actual plea agreement in Mr. Means' case to the defense, the district court denied Mr. Pearson's motion because the evidence was made available to the defense in time to use at trial.

[¶35] In *Brady,* 373 U.S. at 87, 83 S. Ct. at 1196, the United States Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *See also Wilkening v. State,* 2007 WY 187, ¶ 7, 172 P.3d 385, 386-87 (Wyo. 2007). "The Court later held that due process also requires the prosecution to disclose impeachment evidence, including plea agreements made with witnesses." *Worley v. State,* 2017 WY 3, ¶ 14, 386 P.3d 765, 770 (Wyo. 2017), citing *United States v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985) and *Giglio*, 405 U.S. at 154, 92 S. Ct. at 766.

[¶36] To establish that the prosecution violated due process by suppressing exculpatory evidence, Mr. Pearson has the burden of establishing that the prosecution suppressed evidence, the evidence was favorable to the defense, and the evidence was material because it is reasonably probable that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Worley,* ¶ 14, 386 P.3d at 770.

[¶37] We held in *Thomas v. State,* 2006 WY 34, ¶ 16, 131 P.3d 348, 353 (Wyo. 2006) (citations omitted), that

> [t]he delayed disclosure of *Brady* materials is not always grounds for reversal. As long as disclosure is made before it is too late for the defendant to make use of the evidence, due process is satisfied. *Brady* is not violated when the material is available to the defendant during trial. The essence of *Brady* is the discovery of information *after the trial,* which was known to the prosecution but unknown to the defense during the trial. Thus, where exculpatory evidence is discovered during the trial and defense counsel has the opportunity to use it in cross-examination, closing argument, or other parts of the defense case, courts generally do not find a due process violation.

[¶38] Mr. Means had been detained out of town, and the State did not meet with him and enter into the agreement until the Friday before trial, and it then promptly notified defense counsel. The State disclosed its immunity and plea agreements with Mr. Means prior to trial, and the defense had the opportunity to use that information to impeach Mr. Means. *Compare Giglio,* 405 U.S. at 151-53, 92 S. Ct. at 764-65 (agreement not to prosecute witness in exchange for his testimony was not disclosed to the defense until after trial). The State explored the immunity and plea agreements with Mr. Means during

his direct examination. Although the defense could have used the information when questioning Mr. Means, it did not do so. Therefore, under *Thomas* and *Brady,* the prosecution did not suppress the evidence in violation of due process.

[¶39] Mr. Pearson also asserts it was reasonably probable that, had the evidence been disclosed to him, the result of his trial would have been different. Relying on *United States v. Bagley,* 473 U.S. 667, 683-84, 105 S. Ct. 3375, 3384, 87 L. Ed. 2d 481 (1985), Mr. Pearson argues that defense counsel's preparation and presentation of the case was compromised because of the late disclosure of the impeachment evidence. He claims defense counsel had to divert "time and effort from the case he had already prepared" in order to look into the evidence of the agreements between Mr. Means and the State.

[¶40] In *Bagley,* 473 U.S. at 683-84, 105 S. Ct. at 3384, the United States Supreme Court stated that the prosecution's failure to disclose impeachment evidence may have impaired the defendant's ability to prepare and present its case, thereby violating his right to due process of law. However, in that case, the disclosure did not come until after trial and the Supreme Court ruled that there was "a significant likelihood" that the prosecutor's failure to disclose a reward offered to two government witnesses "misleadingly induced defense counsel to believe [the witnesses] could not be impeached on the basis of bias or interest arising from inducements offered by the Government." *Id.* at 683.

[¶41] In Mr. Pearson's case, by contrast, defense counsel received information about the immunity and plea agreements prior to the start of trial. Although he knew about the agreements, he did not use that information to impeach Mr. Means. Additionally, there is nothing in the record to support Mr. Pearson's assertion that the late disclosure otherwise impacted defense counsel's preparation. Defense counsel focused on Mr. Means' drug use on the night of the fire to undermine his credibility. He succeeded in having Mr. Means testify that Ms. Evans frequently angered people by "scamming" them for drugs or money, raising the possibility that someone else wanted to kill Ms. Evans. Mr. Means also testified on cross examination that Mr. Pearson was respectful and civil when he came to Room 315 looking for Ms. Evans. Defense counsel emphasized those aspects of Mr. Means' testimony in closing argument. The situation addressed in *Bagley* simply does not exist in this case. Because the State disclosed the information about the immunity and plea agreements prior to the trial and the defense had the opportunity to use the evidence at trial, there was no due process violation under *Brady, Giglio* or *Bagley.*

[¶42] Finally, Mr. Pearson argues that the district court's failure to exclude Mr. Means' testimony did "nothing to address the misconduct of the prosecutor" in failing to provide the information in a timely manner. Mr. Pearson's argument on appeal is limited to his claim that his due process rights under *Brady* and its progeny were violated. Given there

was no *Brady* violation, Mr. Pearson has not provided a basis to conclude the prosecutor committed misconduct.[3]

[¶43]   Affirmed.

---

[3] Mr. Pearson does not argue that the district court abused its discretion by refusing to sanction the State for the late disclosure of the information under the rules of criminal procedure. *See, e.g.*, *Brown v. State,* 2016 WY 107, ¶¶ 10-21, 383 P.3d 631, 633-35 (Wyo. 2016) (analyzing whether the State's late disclosure of evidence violated W.R.Cr.P. 16 and whether the trial court abused its discretion by refusing to exclude that evidence).  Although we do not condone late production of evidence to the defense, we will not address the question of whether the prosecution committed misconduct by violating its discovery obligations under Rule 16 because it was not properly raised or briefed on appeal.